346 F.Supp.2d 538 (2004)
In re: SOUTH AFRICAN APARTHEID LITIGATION.
Lungisile Ntsebeza, et al., Plaintiffs,
v.
Citigroup, Inc., et al., Defendants.
Hermina Digwamaje, et al., Plaintiffs,
v.
IBM Corporation, et al., Defendants.
Frank Brown, et al., Plaintiffs,
v.
Amdahl Corp., et al., Defendants.
Lungisile Ntsebeza, et al., Plaintiffs,
v.
Oerlikon Contraves AG, et al., Defendants.
Lungisile Ntsebeza, et al., Plaintiffs,
v.
Holcim Ltd., et al., Defendants.
Lungisile NTSEBEZA, et al., Plaintiffs,
v.
Schindler AG, et al., Defendants.
Lungisile Ntsebeza, et al., Plaintiffs,
v.
EMS AG, et al., Defendants.
Lungisile Ntsebeza, et al., Plaintiffs,
v.
Exxon Mobil Corporation, et al., Defendants.
Lungisile Ntsebeza, et al., Plaintiffs,
v.
American Isuzu Motors Inc., et al., Defendants.
Khulumani, et al., Plaintiffs,
v.
Barclays National Bank Ltd., et al., Defendants.
MDL No. 1499(JES), 02 Civ. 4712(JES), 02 Civ. 6218(JES), 02 Civ. 10062(JES), 03 Civ. 1023CJES), 03 Civ. 1024(JES), 03 Civ. 1025(JES), 03 Civ. 1026(JES), 03 Civ. 4524UES).
United States District Court, S.D. New York.
November 29, 2004.
*540 Fagan & Associates, Short Hills, NJ (Edward D. Fagan, of counsel), for Ntsebeza Plaintiffs.
Nagel Rice Dreifuss & Mazie, Livingston, NJ (Diane E. Sammons, of counsel), for Ntsebeza Plaintiffs.
Law Offices of Paul M. Ngobeni, East Hartford, CT (Paul M. Ngobeni, of counsel), for Digwamaje Plaintiffs.
Law Offices of Kweku J. Hanson, Hartford, CT (Kweku J. Hanson, of counsel), for Digwamaje Plaintiffs.
Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington, DC (Michael D.
*541 Hausfeld, Agnieszka M. Fryszman, of counsel), for Khulumani Plaintiffs.
Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York, NY (Linda P. Nussbaum, of counsel), for Khulumani Plaintiffs.
Cravath, Swaine & Moore, LLP, New York, NY (Ronald S. Rolfe, Francis P. Barron, David Greenwald, of counsel), for Defendant UBS AG.
White & Case LLP, New York, NY (Owen C. Pell, Karen M. Asner, of counsel), for Defendant Citigroup, Inc.
Covington & Burling, Washington, DC (Robert N. Sayler, Donald Ridings, Jr., Sean Reid, of counsel), for Defendant Minnesota Mining and Manufacturing Co.
Shea & Gardner, Washington, DC (Paul R. Friedman, William F. Sheehan, William R. Kirschner, of counsel), for Defendant General Elec. Co.
Sedgwick, Detert, Moran & Arnold, New York, NY (James T. Conlon, of counsel), for Defendant Bristol-Myers Squibb.
Gibbons, Del Deo, Dolan, Griffinger & Vecchione, P.C., New York, NY (Terry Myers, Anthony A. Dean, Thomas Valen, Jennifer A. Hradil, of counsel), for Defendants Commerzbank AG and Dresdner Bank AG.
Cravath, Swaine & Moore LLP, New York, NY (Evan R. Chesler, of counsel), for Defendant E.I. Dupont de Nemours.
Cravath, Swaine & Moore LLP, New York, NY (Rory 0. Millson, of counsel), for Defendant Shell Oil Co.
Cravath, Swaine & Moore LLP, New York, NY (Sandra C. Goldstein, of counsel), for Defendant Xerox Corp.
Cravath, Swaine & Moore LLP, New York, NY (Keith R. Humel, of counsel), for Defendant IBM.
Jones Day, New York, NY (Jayant W. Tambe, Cleveland, OH and Robert S. Walker, of counsel), for Defendant General Motors.
Kirkland & Ellis LLP, Washington, DC (Thomas D. Yannucci, P.C., Christopher Landau, Brant W. Bishop, Susan Kearns, of counsel), for Defendant Honeywell Intern., Inc.
Weil, Gotshal & Manges LLP, New York, NY (James W. Quinn, Arvin Maskin, Konrad L. Cailteux, Nina Nagler, of counsel), for Defendant ExxonMobil Corp.
Milbank, Tweed, Hadley & McCloy LLP, New York, NY (Jeffrey Barist, Jeffrey Nagel, of counsel), for Defendant Deutsche Bank AG.
Wachtell, Lipton, Rosen & Katz, New York, NY (Peter C. Hein, Michael A. Charish, of counsel), for Defendant Colgate-Palmolive.
Kelley Drye & Warren LLP, New York, NY (Bud Holman, Kevin J. Walsh, Michael C. Lynch, of counsel), for Defendant National Westminster Bank Pic.
O'Melveny & Myers LLP, Washington, DC (John H. Beisner, John F. Niblock, of counsel), for Defendants Bank of America, N.A., Dow Chemical Co., and Ford Motor Co.
Lovells, New York, NY (Gary S. Lee, Marc J. Gottridge, of counsel), for Defendant Barclays Bank Plc.
Howrey Simon Arnold & White, LLP, Washington, DC (Alan M. Grimaldi, Patricia G. Butler, of counsel), for Defendant Coca-Cola Co.
Clifford Chance U.S. LLP, New York, NY (Joseph P. Cyr, Rae Lindsay, of counsel), for Defendant J.P. Morgan Chase & Co.
Shearman & Sterling LLP, New York, NY (Frederick T. Davis, of counsel), for Defendant Credit Agricole Indosuez.
*542 Drinker Biddle & Reath LLP, Philadelphia, PA (Michael J. Holston, John F. Schultz, Kristofor T. Henning, of counsel), for Defendant Hewlett-Packard Co.
Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY (Jerome S. Hirsch, Susan L. Saltzstein, of counsel), for Defendant DaimlerChryler Corp.
Zuckerman Spaeder LLP, Washington, DC (Graeme W. Bush, of counsel), for Defendant EMS-Chemie (North America) Inc.
Jones Day, New York, NY (Jayant W. Tambe, San Francisco, CA, Robert A. Mittelstaedt, of counsel), for Defendant ChevronTexaco Corp. and Chevron Texaco Global Energy.
Malaby, Carlisle & Bradley LLC, New York, NY (William J. Mendrzycki, of counsel), for Defendant American Isuzu Motors Inc.
Mayer, Brown, Rowe & Maw LLP, New York, NY (Thomas M. Mueller, Michael 0. Ware, of counsel), for Defendant Nestle USA, Inc.
Shaw Pittman LLP, Washington, DC (David J. Cynamon, Alex C. Lakatos, of counsel), for Defendant Holcim (US) Inc.
Morrison & Foerster LLP, New York, NY (Mark P. Ladner, Oliver P. Metzger, of counsel), for Defendant Fujitsu Limited.
Wilmer, Cutler & Pickering, New York, NY (Roger M. Witten, of counsel), for Defendant Credit Suisse Group.
Sullivan & Cromwell LLP, New York, NY, (John L. Warden, Bruce E. Clark, of counsel), for Defendant BP plc.

MEMORANDUM OPINION AND ORDER
SPRIZZO, District Judge.

THIS DOCUMENT RELATES TO:
Three groups of plaintiffs led by Lungisile Ntsebeza ("Ntsebeza plaintiffs"),[1] Hermina Digwamaje ("Digwamaje plaintiffs"), and the Khulumani Support Group ("Khulumani plaintiffs") (collectively "plaintiffs"), respectively, filed the above actions in eight federal district courts against a slew of multinational corporations that did business in apartheid South Africa. The actions, which were transferred to this Court by the Judicial Panel on Multidistrict Litigation, allege, among other things, that defendants violated international law and thus are subject to suit in United States federal district court under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), and other jurisdictional provisions.[2] Defendants,[3] UBS AG, Citigroup, Inc., Minnesota Mining and Manufacturing Co., General Electric Co., Bristol-Myers Squibb Co., Commerzbank AG, Dresdner Bank AG, E.I. DuPont de Nemours, Shell Oil Co., Xerox Corp., IBM Corp., General Motors, Honeywell International, Inc., ExxonMobil Corp., Deutsche Bank AG, Colgate-Palmolive Co., National Westminster Bank Pic, Bank of America, N.A., Dow Chemical Co., Ford Motor Co., Barclays Bank Pic, Coca-Cola Co., J.P. Morgan Chase & Co., Credit Agricole Indosuez, Hewlett-Packard Co., DaimlerChrysler Corp., EMS-Chemie (North America) Inc., ChevronTexaco *543 Corp., ChevronTexaco Global Energy, American Isuzu Motors, Inc., Nestle USA, Inc., Holcim (US) Inc., Fujitsu Limited, Credit Suisse Group, and BP Pic ("defendants"), bring this motion to dismiss the complaints, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for lack of subject matter jurisdiction and for failure to state a claim upon which relief can be granted.[4] Because the Court finds that the various Complaints do not sufficiently allege that defendants violated international law, this Court lacks subject matter jurisdiction under the ATCA and therefore defendants' motion is granted and plaintiffs' complaints are dismissed.[5]

BACKGROUND
According to the allegations set forth in the various complaints,[6] the 1948 South African elections witnessed the rise to power of the National Party. Building on laws that restricted the African majority in the country, the National Party erected a system whereby a group of inhabitants who accounted for just fourteen percent of the population completely ruled over the country and controlled all aspects of life. See Khulumani Complaint ("K.Compl.") ¶¶ 140-44, 197. That systemapartheid shockingly and regrettably reigned supreme over an entire country and its people until just over one decade ago.[7]
The history of apartheid is one marked by hatred, racism, and inhuman treatment. Fueled by the desire to exact the greatest possible benefit from an African majority that had no official purpose except to "work for [whites]," Digwamaje Second Amended Class Action Complaint ("D.Compl.") ¶ 85, the apartheid regime engaged in practices that were deemed by some as "repugnant to the moral and political values of democratic and free societies," Exec. Order No. 12,532, 50 Fed.Reg. 36,861 (Sept. 9, 1985), and by others as nothing short of "a crime against humanity," International Convention on the Suppression and Punishment of the Crime of Apartheid, November 30, 1973, art. I, 1015 U.N.T.S. 243, 245.
The regime retained a stranglehold on power by enacting a number of laws that all but assured that Africans would remain in a state of near-enslavement. The Bantu Authorities Act of 1951 and amendments *544 thereto relegated Africans to certain lands called "bantustans" and restricted their access to all outside urban areas. See K. Compl. ¶¶ 152-57; D. Compl. ¶¶ 71-72. In order to simply gain access to these urban areas Africans were required to carry pass books, which contained information as to each person's identity, ethnic group, and employer. See D. Compl. ¶ 79. Once employment was terminated it would be noted on the pass book and the individual would be sent back to life on the bantustan. See id. ¶ 79; K. Compl. ¶¶ 56-57.
Life on the bantustan was far from desirable and it represented a sharp contrast with the lifestyles of the white minority. Most inhabitants fell below the poverty line. See K. Compl. ¶¶ 186-87. Disease and malnourishment were prevalent, while economic opportunities, suitable housing, and basic amenities were non-existent. See id. ¶¶ 188-90, 193-96. To the apartheid regime the bantustan represented nothing more than a "reserve army of unemployed" whose sole purpose was to wait for its call to duty "for the sake of the white economy." D. Compl. ¶¶ 81, 84. The white minority benefitted greatly from this exploitation, earning on average four times as much income and suffering far less from diseases and lack of resources. See K. Compl. ¶¶ 189, 192,196-97.
The Complaints further allege that in addition to relegating Africans to substandard living conditions, the apartheid regime maintained a brutal and vicious policy of repression. Through the South African Police and the South African Defense Force, the apartheid regime cracked down on African demonstrations and resistance movements. In 1960, at a Sharpeville demonstration, police fired into a crowd killing sixty-nine people and wounding almost two hundred others. See id. ¶ 203; D. Compl. ¶ 103. Antiapartheid leaders were summarily killed or imprisoned. See Ntsebeza Second Consolidated and Amended Complaint ("N.Compl.")[8] ¶¶ 165, 173; D. Compl. ¶¶ 104, 107, 111. The regime even resorted to "massive violence against and killings of ... schoolchildren and students," S.C. Res. 418, U.N. SCOR, 32d Sess., U.N. Doc. S/INF/33 (1977), including the killings of unarmed students in Soweto in 1976.[9]See K. Compl. ¶ 1206; D. Compl. ¶ 110. Arbitrary arrests, sexual and physical abuse, and torture were commonplace. See K. Compl. ¶¶ 14-108, 207, 212, 216-19; D. Compl. §§ 5-26; N. Compl. ¶¶ 34-41.
Defendants did business in South Africa during this period. At the least, defendants benefitted from a system that provided a glut of cheap labor. See, e.g., K. Compl. ¶¶ 273-76; N. Compl. ¶¶ 105, 108, 124; D. Compl. ¶¶ 147-52. Frequently, however, defendants supplied resources, such as technology, money, and oil, to the South African government or to entities controlled by the government. See, e.g., K. Compl. ¶¶ 302, 319, 400-01, 431, 501, 588. Not surprisingly, many of those resources *545 were used by the apartheid regime to further its policies of oppression and persecution of the African majority. For example, the South African police shot demonstrators "from cars driven by Daimler-Benz engines," K. Compl. ¶ 531, the regime tracked the whereabouts of African individuals on IBM computers, see K. Compl. ¶¶ 587-602; D. Compl. ¶¶ 189-215, the military kept its machines in working order with oil supplied by Shell, see K. Compl. ¶¶ 319-22, and the government received needed capital and favorable terms of repayment of loans from defendant banks, see K. Compl. ¶¶ 393-425; Brief of Swiss Campaign for Debt Cancellation as Amici Curiae in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss at 2-10.
Defendants had contacts with the apartheid government in other ways as well. Defendants whose sites of operations were deemed key points under the National Key Points Act of 1980 were required to provide high levels of security so as to protect against civil unrest and African uprisings. See K. Compl. ¶¶ 278-81, 549-54. The owners of the sites were required to provide storage facilities for arms and to cooperate with the South African Defense Force to provide local defense of the area. See D. Compl. ¶ ¶ 361; Brief of KOSA as Amici Curiae in Support of Plaintiffs' Opposition to Defendants' Motion to Dismiss at 4 (describing an oil refinery key point as having "several lines of defence" including "an electrified iron curtain," "heavily armed watchtowers," and "military patrols armed to the teeth").
While defendants were benefitting from apartheid policies which provided them with cheap labor, cheap power, and high levels of government services to white areas, see 6 Report of the Reparation and Rehabilitation Committee at 140-41; N. Compl. ¶¶ 19-22, the United Nations was actively engaged in passing resolutions which urged the South African government to dismantle its policy of apartheid, see K. Compl. ¶¶ 224-67; N. Compl. ¶¶ 144-47, 152-53. The General Assembly deemed apartheid "a crime against humanity," G.A. Res. 3068, U.N. GAOR, 28th Sess., Supp. No. 21, at 75, U.N. Doc. A/9030 (1974), and the Security Council declared that "all States shall cease forthwith any provision to South Africa of arms and related materiel of all types," S.C. Res. 418, U.N. SCOR, 32d Sess., U.N. Doc. S/INF/33 (1977). Following these international rebukes of apartheid, many defendants publicly withdrew from South Africa while maintaining profitable entities within the nation that continued to provide goods and services that assisted the regime. See K. Compl. ¶¶ 284-87, 315-16, 558-61, 600-02.
Ntsebeza plaintiffs filed these actions in seven district courts between June 19, 2002 and December 6, 2002 on behalf of the class of individuals who lived in South Africa at any time between 1948 and the present and who suffered damages as a result of the crimes of apartheid. See N. Compl. ¶ 26, 196 (estimating that the class encompasses millions of individuals). Ntsebeza plaintiffs seek equitable relief that includes production of defendants' documents, creation of an international historical commission, and creation of affirmative action and educational programs. See id. ¶ 30.a. They also seek injunctive relief which would prevent the defendants from destroying documents that relate to their investment in apartheid South Africa. See id. ¶ 30.a. Finally, they seek monetary relief that includes restitution and disgorgement of all monies that can be linked to aiding, conspiring with, or benefitting from apartheid South Africa. See id. ¶ 30.b.
*546 Digwamaje plaintiffs filed this action in this District on August 2, 2002. The action was brought on behalf of all persons who lived in South Africa between 1948 and the present and who suffered damages as a result of apartheid. See D. Compl. ¶ 427. Digwamaje plaintiffs seek equitable, injunctive, and monetary relief, see id. ¶ 431, and pray for compensatory and punitive damages in excess of $400,000,000,000, see id. at 142.
Khulumani plaintiffs filed this action in the Eastern District of New York on November 12, 2002. The action was brought on behalf of the Khulumani Support Group and its 32,700 members, as well as individual plaintiffs who suffered from the crimes of the apartheid regime. See K. Compl. ¶¶ 12-108, 685. Khulumani plaintiffs seek relief in the form of disclosure of defendants' documents related to their activities in South Africa, and compensatory and punitive damages. See id. at 169.

DISCUSSION
On a motion to dismiss, the Court must accept all facts alleged in the Complaint as true and must draw all reasonable inferences in favor of the plaintiff. See Jaghory v. New York State Dep't of Educ, 131 F.3d 326, 329 (2d Cir.1997). Dismissal is only appropriate at this stage of the proceedings if it appears beyond doubt that the plaintiff can prove no set of facts which would entitle it to relief. See Sec. Investor Prot. Corp. v. BDO Seidman, LLP, 222 F.3d 63, 68 (2d Cir.2000). Although courts on motions to dismiss are generally limited to examining the sufficiency of the pleadings, where, as here, a challenge is directed at the Court's subject matter jurisdiction, the Court may turn to materials outside the Complaint to resolve jurisdictional issues. See Flores v. S. Peru Copper Corp., 343 F.3d 140, 161 n. 30 (2d Cir.2003); Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir.1998).

A. Plaintiffs' Claims Under the ATCA

The ATCA provides, in full, that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. Although the provision dates back to the eighteenth century, its lack of use led some courts to speculate that "no one seems to know whence it came." IIT v. Vencap, 519 F.2d 1001, 1015 (2d Cir.1975). This Circuit began the modern line of ATCA cases when, in Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir.1980), it decided that in determining jurisdiction under the ATCA the "law of nations" must be understood as an evolving standard that will encompass more than it did at the time of the statute's enactment. See id. at 881. Thus, the Court concluded that acts of torture committed by state officials violate the law of nations and thus support jurisdiction under the ATCA. See id. at 884. Since then courts in this Circuit have ruled that genocide committed by private actors is actionable under the ATCA, Kadic v. Karadzic, 70 F.3d 232, 241-42 (2d Cir.1995), and that jurisdiction is proper over private actors who aid in the commission of human rights violations, Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d 289, 321-24 (S.D.N.Y.2003).
The Supreme Court recently ruled on the scope of the ATCA in Sosa v. AlvarezMachain, ___ U.S. ___, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004). In Sosa, the Supreme Court held that the ATCA was designed to afford the federal courts jurisdiction over well-accepted and clearly-defined offenses under international law such as piracy and offenses involving ambassadors. See id. at 2754-56. The statute was *547 essential at the time of its enactment in 1789 because there was at that time no statute authorizing federal court jurisdiction over such matters. See id. at 2756-59. Thereafter, Congress specifically enacted federal question jurisdiction and has from time to time enacted other legislation creating federal jurisdiction over specific classes of offenses. See, e.g., 28 U.S.C. § 1351 (giving jurisdiction to federal courts for all civil actions against consuls of foreign nations); id. § 1363 (bestowing original jurisdiction on the federal district courts over civil actions "brought for the protection of jurors' employment" under § 1875).
It is against the background of this holding and in that historical context that the issues raised by the present motions must be addressed.
While it would have been unquestionably preferable for the lower federal courts if the Supreme Court had created a brightline rule that limited the ATCA to those violations of international law clearly recognized at the time of its enactment, the Supreme Court left the door at least slightly ajar for the federal courts to apply that statute to a narrow and limited class of international law violations beyond those well-recognized at that time. See Sosa, 124 S.Ct. at 2761, 2764.
That approach, as Justice Scalia noted in his concurring opinion, of course again relegated to the lower federal courts the task of grappling with and determining what offenses against international law fit within that narrow class of offenses.[10] The consequences of leaving that door open, as Justice Scalia stated, were not only to make the task of the lower federal courts immeasurably more difficult, but also to invite the kind of judicial creativity that has caused the disparity of results and differences of opinion that preceded the decision in Sosa. See id. at 2775 (Scalia, J., concurring) (pointing to this Circuit's holding in Kadic, which found a private right of action under the Convention on the Prevention and Punishment of the Crime of Genocide even though Congress explicitly indicated that the treaty was not to be understood as granting one).
However, even though the Sosa decision did not deliver the definitive guidance in this area that some had come to expect, nevertheless it does dispose of the issues raised by these motions.
In Sosa, the Supreme Court set forth the following considerations for courts to consider in determining whether conduct should be found to be encompassed by the ATCA. First, the Court set as a prerequisite that any new claim under the ATCA must "rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized." Id. at 2761-62. Second, courts must be mindful of the changed understanding of common law since the enactment of the ATCA in 1789, and, consistent with the Court's teaching in Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), should be averse to innovate without legislative guidance, especially when making the decision to "exercis[e] a jurisdiction that remained largely in shadow for much of the prior two centuries." Sosa, 124 S.Ct. at 2762. Third, courts should be wary of creating private rights of action from international norms because of the collateral consequences such a decision would have. Id. at *548 2762-63. Fourth, courts must consider the foreign relations consequences of finding that conduct is encompassed by the ATCA, since entertaining such suits can impinge on the discretion of the legislative and executive branches of this country as well as those of other nations. Id. at 2763, 2766 n. 21. Finally, courts must be mindful of the absence of a "congressional mandate to seek out and define new and debatable violations of the law of nations." Id. at 2763.
Tested by these precepts, it is clear that plaintiffs' causes of action under the ATCA must be dismissed.
Plaintiffs have alleged a veritable cornucopia of international law violations, including forced labor, genocide, torture, sexual assault, unlawful detention, extrajudicial killings, war crimes, and racial discrimination. K. Compl. ¶ 682; D. Compl. ¶ 2; N. Compl. ¶ 213. Plaintiffs link defendants to these alleged international law violations in three ways. Plaintiffs contend that defendants engaged in state action by acting under color of law in perpetrating these international law violations,[11] D. Compl. ¶ 1, 256, 283, that defendants aided and abetted the apartheid regime in the commission of these violations, N. Compl. ¶¶ 218-27; D. Compl. ¶¶ 517-22; K. Compl. ¶ 682, and that defendants' business activities alone are sufficient to make out an international law violation, N. Compl. ¶ 230.
Although it is clear that the actions of the apartheid regime were repugnant, and that the decisions of the defendants to do business with that regime may have been morally suspect or "embarrassing," K. Compl. ¶ 449, it is this Court's job to apply the law and not some normative or moral ideal. Cf. Planned Parenthood v. Casey, 505 U.S. 833, 850, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (joint opinion) ("Some of us as individuals find abortion offensive to our most basic principles of morality, but that cannot control our decision. Our obligation is to define the liberty of all, not to mandate our own moral code."). Given the Court's ruling in Sosa, as well as the Second Circuit's decision in Flores, it is clear that none of the theories pleaded by plaintiffs support jurisdiction under the ATCA.

1. State Action
First, it is plain from relevant Second Circuit authority that plaintiffs have not pleaded facts that would allow this Court to find that defendants engaged in state action by acting under color of law in perpetrating the complained-of acts. In Bigio v. Coca-Cola Co., 239 F.3d 440 (2d Cir.2001), the Court explained that state action under the ATCA, which is derived from the color of law requirement of 42 U.S.C. § 1983, required that a private individual "`act[] together with state officials or with significant state aid.'" Bigio, 239 F.3d at 448 (quoting Kadic v. Karadzic, 70 F.3d 232, 245 (2d Cir.1995)).
The Bigio Court found that Coca-Cola did not act under color of law when it purchased property that it knew the Egyptian government had seized from Jewish landowners. Bigio, 239 F.3d at 448-49. The Court concluded that "[a]n indirect economic benefit from unlawful state action is not sufficient" to establish state action. Id. at 449.
Here, plaintiffs do not allege actions by the defendants that elevate them to the status of state actors in the commission of torture, genocide, killings, and other serious *549 crimes. At most, by engaging in business with the South African regime, defendants benefitted from the unlawful state action of the apartheid government.
Plaintiffs make much of Judge Wood's decision in Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386, 2002 WL 319887 (S.D.N.Y. Feb.28, 2002). In Wiwa, plaintiffs alleged that defendants actively cooperated with Nigerian officials in the suppression of a group that was in opposition to the defendants' activities in the region. Id. at *13. Defendants made payments to the military, contracted to purchase weapons for the military, coordinated raids on the group, and paid the military to violently respond to opposition. Id,
These activities are not present here. At most, plaintiffs allege that defendants followed the National Key Points Act and made the necessary preparations to defend their premises from uprisings. See D. Compl. ¶ 361. This activity alone does not constitute joint action with the apartheid regime to commit the slew of international law violations that are complained of. See Atkinson v. B.C.C. Assocs., 829 F.Supp. 637, 646-47 (S.D.N.Y.1993) (indicating that even if the relationship between a private actor and the government would create state action with regard to certain activities, it would not mean that everything done by the private actor would be deemed state action). All other allegations relate to business activities akin to that at issue in Bigio. See D. Compl. ¶¶ 195, 228, 237, 303-04. Defendants engaged in no behavior which, because of its connection with the apartheid regime, "`may be fairly treated as that of the State itself.'" Abdullahi v. Pfizer, Inc., No. 01 Civ. 8118, 2002 WL 31082956, at *5 (S.D.N.Y. Sept.17, 2002) (quoting Blum v. Yaretsky, 457 U.S. 991, 1004, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982)). Because this Court does not find state action, it need not consider whether the actions of the apartheid regime violated the law of nations so as to support jurisdiction under the ATCA.

2. Aiding and Abetting and Doing Business in South Africa
Because defendants did not engage in state action, plaintiffs will need to show that either aiding and abetting international law violations or doing business in apartheid South Africa are violations of the law of nations that are "accepted by the civilized world and defined with a specificity comparable to the features of the 18thcentury paradigms" such as piracy and crimes against ambassadors. Sosa, 124 S.Ct. at 2761-62.
The Second Circuit has described the standard as a violation of "those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." Flores, 343 F.3d at 154. The Flores Court stressed the requirement that the norm be a legal obligation, and not acceded to merely for moral or political reasons. Id. at 154. Also, the norm must be sufficiently definite and not so general as to be simply "aspirational." Id.
Plaintiffs here point to little that would lead this Court to conclude that aiding and abetting international law violations is itself an international law violation that is universally accepted as a legal obligation. Plaintiffs point to the International Criminal Tribunals for the former Yugoslavia, ICTY STAT. art. 7(1), and Rwanda, ICTR STAT, art 6(1), respectively, the Nuremberg trials, the International Convention on the Suppression and Punishment of the Crime of Apartheid ("Apartheid Convention"), November 30, 1973, art. I, 1015 U.N.T.S. 243, 245, and this Court's ruling in Presbyterian Church of Sudan v. Talisman Energy, Inc., 244 F.Supp.2d 289 (S.D.N.Y.2003). None of these sources establishes *550 a clearly-defined norm for ATCA purposes.
The International Criminal Tribunals and rulings pursuant thereto, besides dealing with criminal and not civil matters, are not binding sources of international law. See Flores, 343 F.3d at 169-70. The same applies for the Nuremberg trials. The Apartheid Convention, which similarly dealt with the criminal repercussions for aiding apartheid, was not ratified by a number of major world powers, including the United States, Great Britain, Germany, France, Canada, and Japan. See Participants to International Convention on the Suppression and Punishment of the Crime of Apartheid reprinted in Appendix of Declarations and Cited Public Materials to the Memorandum of Law in Support of Defendants' Joint Motion to Dismiss at A357. Without the backing of so many major world powers, the Apartheid Convention is not binding international law. See Flores, 343 F.3d at 163 n. 33.
Finally, this Court declines the invitation to follow the lead of Presbyterian Church in finding that aider and abettor liability is recognized under the ATCA. This is especially true since the applicability of that concept in a civil context is dubious at best.
In Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), the Supreme Court, in dealing with the issue of aiding and abetting in the civil context, stated that the concept was "at best uncertain in application." Id. at 181, 114 S.Ct. 1439. Therefore, the Court held that where Congress has not explicitly provided for aider and abettor liability in civil causes of action, it should not be inferred. Id. at 181-82, 189-90, 114 S.Ct. 1439. The Court reasoned that in the context of Rule 10b-5 actions, allowing aider and abettor liability would only serve to compound the problems that already existed with the cause of action, including vexatious litigation and strike suits. Id. at 189, 114 S.Ct. 1439. The rule in Central Bank has been applied to other civil causes of action. See, e.g., Dinsmore v. Squadron, Ellenoff, Plesent, Sheinfeld & Sorkin, 135 F.3d 837, 841 (2d Cir.1998) (applying Central Bank to conspiracy claims under Rule 10b-5); Hayden v. Paul, Weiss, Rifkind, Wharton & Garrison, 955 F.Supp. 248, 255 (S.D.N.Y.1997) (extending Central Bank to actions under the Racketeer Influenced and Corrupt Organizations Act).
Central Bank applies with special force here. Although the ATCA points to international law for the causes of action over which it grants jurisdiction,[12] the ATCA presently does not provide for aider and abettor liability, and this Court will not write it into the statute. In refusing to do so, this Court finds this approach to be heedful of the admonition in Sosa that Congress should be deferred to with respect to innovative interpretations of that statute.
This conclusion is strengthened by the policies behind Central Bank and is in accord with the framework announced by Sosa. To allow for expanded liability, without congressional mandate, in an area that is so ripe for non-meritorious and blunderbuss suits would be an abdication of this Court's duty to engage in "vigilant door *551 keeping." Sosa, 124 S.Ct. at 2764; cf. Statement of President George Bush Upon Signing H.R.2092, 1992 U.S.C.C.A.N. 91 (Mar. 12, 1992) (expressing concern that cause of action created by Torture Victim Protection Act would overburden the courts with "ill-founded or politically motivated suits, which have nothing to do with the United States and which offer little prospect of successful recovery").
This Court is also mindful of the collateral consequences and possible foreign relations repercussions that would result from allowing courts in this country to hear civil suits for the aiding and abetting of violations of international norms across the globe.[13] To do so would not be consistent with the "restrained conception" of new international law violations that the Supreme Court has mandated for the lower federal courts.[14]
The final possible basis upon which to ground ATCA jurisdiction here is the theory that defendants violated the law of nations by doing business in apartheid South Africa. Although plaintiffs repeatedly indicated that "[t]his lawsuit is not about whether a company can do business with a repressive regime," Khulumani Plaintiffs' Response to Defendants' Joint Motion to Dismiss at 1; see also Memorandum of Law in Opposition to Defendants' Joint Motion to Dismiss at 17; Transcript of Oral Argument, dated November 6, 2003, at 96, plaintiffs' complaints are almost solely composed of allegations of defendants' business activities within South Africa and the consequences that flowed therefrom.
Plaintiffs have pointed to a multitude of sources that they claim establishes that doing business with the apartheid regime was a violation of the law of nations.[15] Plaintiffs rely on several treatiesthe U.N. Charter, June 26, 1945, 16 U.S.T. 1134, the Convention on the Prevention and Punishment of the Crime of Genocide ("Genocide Convention"), Dec. 9, 1948, S. Exec. Doc. O, 81-1, 78 U.N.T.S. 277, the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), Dec. 10, 1984, S. Treaty Doc. No. 100-20, 1465 U.N.T.S. 85, the International Covenant on Civil and Political Rights ("ICCPR"), Dec. 16, 1966, 999 U.N.T.S. 171, 6 I.L.M. 368, and the Apartheid Convention, November 30, 1973, 1015 U.N.T.S. 243as well as a number of General Assembly and Security Council declarations and resolutions and the Restatement (Third) of Foreign Relations Law. See D. Compl. ¶ 465; K. Compl. ¶¶ 638-39, 648.
Although treaties that set forth definite rules and enjoy overwhelming acceptance *552 and adherence are valid sources of international norms for ATCA purposes, see Flores, 343 F.3d at 157-59, the treaties relied on by plaintiffs suffer from a number of defects that preclude findings that any of them provide applicable customary international law.
Although the Genocide Convention and the Convention Against Torture, which prohibit "acts committed with intent to destroy, in whole or in part, a national, ethnical, racial or religious group," Genocide Convention, art. 2, 78 U.N.T.S. at 280, and "any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person ... for any reason based on discrimination of any kind," Convention Against Torture, art. 1, 1465 U.N.T.S. at 113-14, respectively, may apply to the acts undertaken by the apartheid regime itself, they nonetheless do not describe the actions undertaken by defendants here. While both punish complicity in engaging in such acts, both conventions are criminal in nature, and neither is self-executing. See Genocide Convention, art. 5, 78 U.N.T.S. at 280; Convention Against Torture, S. Treaty Doc. No. 100-20 (declaring that United States deems articles one through sixteen not to be self-executing). Therefore, there is no private liability under the treaties in United States courts. See Flores, 343 F.3d at 163. It follows that no liability based upon any alleged violation of these norms can form an adequate predicate for jurisdiction under the ATCA.
The ICCPR, which the United States also deemed not to be self-executing, see Sosa, 124 S.Ct. at 2767, deals primarily with ensuring that state actors do not violate the rights of their citizens. For example, the ICCPR, proclaims that "[e]ach State Party to the present Covenant undertakes to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant," ICCPR, art. 2, 999 U.N.T.S. at 173, which include the right not to be enslaved, art. 8, id. at 175, the right to be free from arbitrary detention, art. 9, id., and the right to be equal before the law, art. 26, id. at 179. Again, although these provisions may apply to the apartheid regime, they do not apply to the actions of defendants.[16]
The other authorities relied on by plaintiffs simply do not create binding international law. As stated earlier, the Apartheid Convention, not having been adopted by most world powers, did not create binding international law actionable under the ATCA. The UN Charter, General Assembly resolutions, and the Declaration of Human Rights ("Declaration"), G.A. Res. 217A (III), U.N. Doc. A/810 (1948), are also insufficient for that purpose.
The UN Charter and the Declaration speak in broad aspirational language that does not meet the specificity required under the ATCA.[17] For example, the Declaration *553 advances a number of the ideals later set forth in the treaties that plaintiffs rely upon, see arts. 4, 5, 7, 9 (prohibiting slavery, torture, discrimination, and arbitrary arrest), as well as the goal of "equal pay for equal work," see art. 23. The Declaration, however, creates no legal obligations, see Sosa, 124 S.Ct. at 2767, and the language cited above, which could arguably be applied to defendants here, see N. Compl.¶¶ 228-56, is simply not specific enough to create binding legal rules, see Flores, 343 F.3d at 160-61 (finding that rights to health and life are too indefinite and express "virtuous goals" only).
General Assembly resolutions are similarly not valid sources of international law. See Flores, 343 F.3d at 165. Although the UN repeatedly condemned apartheid, see, e.g., G.A. Res. 3068, U.N. GAOR, 28th Sess., Supp. No. 21, at 75, U.N. Doc. A/9030 (1974), it simply does not have the power to legally bind member states. The only binding sanction passed by the UN was an embargo that prohibited all states from exporting arms to the apartheid regime. S.C. Res. 418, U.N. SCOR, 32d Sess., U.N. Doc. S/INF/33 (1977). Moreover, like the treaties discussed above, this Security Council resolution simply does not apply to defendants.
The only materials that plaintiffs cite that even apply to defendants are a series of General Assembly resolutions that "[c]ondemn[ ] ... transnational corporations and financial institutions that have increased political, economic and military collaboration with the racist minority regime of South Africa." G.A. Res. 38/39, U.N. GAOR, 38th Session (1983); see also G.A. Res. 38/50, U.N. GAOR, 38th Session (1983); K. Compl. ¶¶ 258-67. Despite the strong rhetoric, these resolutions simply recommend that nations pass legislation that will cut off the apartheid regime from the rest of the world. They do not impose binding legal obligations.
Even if this Court were swayed by the non-binding General Assembly resolutions calling for an end to defendants' business activities in South Africa, it is clear from history and from the factors announced by the Court in Sosa, and discussed above, that the opinions expressed by these resolutions never matured into customary international law actionable under the ATCA.
Moreover, as Sosa points out, this Court must be aware of the collateral consequences that would result from finding a new international law violation that would support ATCA jurisdiction. In this case, those consequences are not only far-reaching but would raise the prospect of serious impediments to the flow of international commerce. Indeed, the South African government has indicated that it does not support this litigation and that it believes that allowing this action to proceed would preempt the ability of the government to handle domestic matters and would discourage needed investment in the South African economy. See Declaration of Minister Penuell Mpapa Maduna, dated July 11, 2003 at ¶¶ 10, 12. Similarly, the United States government has expressed its belief that the adjudication of this suit would cause tension between the United States and South Africa and would serve to hamper the policy of encouraging positive change in developing countries via economic investment. See Statement of Interest of the United States, dated October 30, 2003. As the Sosa Court made clear, these opinions as to the foreign relations consequences of this action certainly *554 deserve great weight. See Sosa, 124 S.Ct. at 2766 n. 21 (mentioning this case specifically and stating that "[i]n such cases, there is a strong argument that federal courts should give serious weight to the Executive Branch's view of the case's impact on foreign policy").
In a world where many countries may fall considerably short of ideal economic, political, and social conditions, this Court must be extremely cautious in permitting suits here based upon a corporation's doing business in countries with less than stellar human rights records, especially since the consequences of such an approach could have significant, if not disastrous, effects on international commerce. Moreover, to infer such causes of action under the ATCA would expand precipitously the jurisdiction of the federal courts and would not be consistent with the "extraordinary care and restraint" that this Court must exercise in recognizing new violations of customary international law. See Flores, 343 F.3d at 154; cf. Thompson v. Oklahoma, 487 U.S. 815, 854-55, 108 S.Ct. 2687, 101 L.Ed.2d 702 (1988) (O'Connor, J., concurring) (discussing the danger of hastily deciding that certain practices have become customary).
Finally, far from there being a congressional mandate to find a cause of action here, history indicates that Congress, consistent with most other world powers, supported and encouraged business investment in apartheid South Africa. The Comprehensive Anti-Apartheid Act of 1986, 100 Stat. 1086, placed a minimal amount of restrictions on business activities with South Africa. This policy of constructive engagement was similar to the policies of many of the world powers at the time. See Declaration of Lord Renwick, dated July 9, 2003 at ¶¶ 9-13 (explaining that the United Kingdom believed that investment in South Africa was the best way to work towards change); Declaration of Rudolf Dolzer, dated July 9, 2003 at ¶¶ 3, 25, 30 (same with regards to Germany); Declaration of Mathias-Charles Krafft, dated July 4, 2003 at ¶¶ 5, 9 (Switzerland). As the government makes clear in this case, the United States still relies on the tool of economic investment as a means to achieve greater respect for human rights and a reduction in poverty in developing countries. See Statement of Interest of the United States, dated October 30, 2003. Therefore, under the framework set forth by the Court in Sosa, this Court finds that doing business in apartheid South Africa is not a violation of international law that would support jurisdiction in federal court under the ATCA.
Therefore, this Court finds that there is no subject matter jurisdiction under the ATCA, and thus all claims thereunder, including those for human rights violations, crimes against humanity, unfair labor practices, and all other premised under international law, must be dismissed. Because this Court finds no cause of action under international law, plaintiffs have failed to state claims upon which to ground jurisdiction under 28 U.S.C. §§ 1331 and 1332.[18]

*555 B. Digwamaje Plaintiffs' Claims Under the TVPA and RICO

The Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note, establishes a civil action against an "individual who, under actual or apparent authority, or color of law, of any foreign nation" subjects another to "torture" or "extrajudicial killing." 28 U.S.C. § 1350 note. In order to hear an action under this provision, the Court must be satisfied that plaintiff has exhausted all remedies in the place where the conduct occurred. Id.
Here, defendants did not engage in torture or extrajudicial killings. Because this is abundantly clear, Digwamaje plaintiffs rely on the concept of aider and abettor liability to make the necessary connection between defendants and the prohibited conduct. Plaintiffs again look to Judge Wood's decision in Wiwa for support. See Wiwa v. Royal Dutch Petroleum Co., No. 96 Civ. 8386, 2002 WL 319887, at *15-16 (S.D.N.Y. Feb.28, 2002) (finding that aider and abettor liability is justified under the TVPA because of its language and legislative history).
This Court believes that Wiwa is distinguishable. In Wiwa, defendants were found to be acting under color of law in the perpetration of torture and extrajudicial killings. See id. at *14-15. Here, defendants were not acting under color of law. See supra part A.l. Since a prerequisite to TVPA liability is that the individual be acting under color of law, this Court finds that creating aider and abettor liability for private actors not acting under color of law would be inconsistent with the statute and precluded by Central Bank.
Because this Court finds that Digwamaje plaintiffs have failed to state a claim under the TVPA, that cause of action must be dismissed.[19]
Digwamaje plaintiffs' final claim is that defendants violated several provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), codified at 18 U.S.C. § 1962(b), (c), and (d). These provisions make it unlawful, among other things, "for any person employed by or associated with any enterprise ... to conduct or participate ... in the conduct of such enterprise's affairs through a pattern of racketeering activity," § 1962(c), for such person to acquire an interest in any such enterprise "through a pattern of racketeering activity," § 1962(b), or for a person to conspire to do either of those two activities, § 1962(d).
Because RICO is silent as to its extraterritorial application, this Court must determine if Congress would have intended to exercise jurisdiction over this predominantly foreign matter. See North South Fin. Corp. v. Al-Turki, 100 F.3d 1046, 1051 (2d Cir.1996); see also Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir.1975). In making this finding, the Court is guided by two tests that were borrowed from the international securities *556 and antitrust fieldsthe conduct test and the effects test.
The conduct test is satisfied where conduct material to the activities occurred in the United States and directly caused the loss suffered by plaintiffs. See North South, 100 F.3d at 1051-52. Mere preparation and incidental conduct are insufficient to justify jurisdiction. See Societe Nationale d'Exploitation Industrielle des Tabacs et Allumettes v. Salomon Bros. Int'l Ltd., 928 F.Supp. 398, 403-07 (S.D.N.Y.1996); Philan Ins. Ltd. v. Frank B. Hall & Co., 748 F.Supp. 190, 194 (S.D.N.Y.1990).
Here, there is no meaningful assertion that any conduct occurred in the United States which directly caused the injuries complained of in South Africa. Plaintiffs allege a panoply of racketeering activities that all took place in South Africa and caused the alleged loss in South Africa. See D. Compl. ¶ 512. The gravamen of this complaint deals with foreign actions, and therefore this Court finds that the conduct test is not satisfied. See Giro v. Banco Espanol de Credito, S.A., No. 98 Civ. 6195,1999 WL 440462, at *3 (S.D.N.Y. June 28,1999).
The effects test is satisfied where the foreign activities have substantial direct effects in the United States, or where the conduct is intended to and does have an effect here. See North South, 100 F.3d at 1052. Remote and indirect effects, see Consolidated Gold Fields Pic v. Minorco, S.A., 871 F.2d 252, 262 (2d Cir.1989), as well as generalized effects in the United States are insufficient to meet this standard, see Bersch, 519 F.2d at 988-89.
Here, besides the conclusory allegation that "Defendants' acts alleged herein have substantial effect within the United States," D. Compl. ¶ 514, there is an utter dearth of facts that would establish any effects whatsoever, much less substantial and direct ones. It is difficult to imagine how the alleged murders, tortures, crimes against humanity, and other heinous acts committed in South Africa had direct and substantial effects here, and why Congress would have intended to exercise jurisdiction over these actions instead of "leav[ing] the problem to foreign countries." Bersch, 519 F.2d at 985; see El Cid, Ltd. v. New Jersey Zinc Co., 551 F.Supp. 626, 631 (S.D.N.Y.1982); see also Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc., 592 F.2d 409, 417 n. 12 (8th Cir.1979); Aldana v. Fresh Del Monte Produce, Inc., 305 F.Supp.2d 1285, 1306 (S.D.Fla.2003).
Therefore, this Court rules that it does not have jurisdiction to hear this RICO claim.
Even if this Court does have jurisdiction over this claim, plaintiffs have failed to state an actionable RICO claim. Because this claim borders on the frivolous, this Court will refrain from highlighting every shortcoming. To state a claim, plaintiffs must plead that defendants formed a racketeering enterprise, which RICO defines to "include[ ] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The Courts have explained that an enterprise is "`a group of persons associated together for a common purpose of engaging in a course of conduct,' the existence of which is proven `by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit.'" First Capital Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 173 (2d Cir.2004) (quoting United States v. Turkette, 452 U.S. 576, 583, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981)).
*557 Here, drawing all reasonable inferences in favor of plaintiffs, this Court is at a loss to see anything even approaching a racketeering enterprise. Plaintiffs simply state that "Defendants corporations, and their agents and co-conspirators formed a RICO `enterprise'" or "an association in fact." D. Compl. ¶¶503-04. It is unexplained what the "common purpose" of defendants was, or what "particular fraudulent course of conduct" was engaged in, or exactly how defendants, which are engaged in a multitude of different industries, "work[ed] together to achieve such purposes." First Capital Asset Mgmt, 385 F.3d at 174 (quoting First Nationwide Bank v. Gelt Funding, Corp., 820 F.Supp. 89, 98 (S.D.N.Y.1993)). Conclusory allegations that a group of corporations, whose sole common feature was the doing of business in a nation of millions of people at some point in a period of over forty years, is a RICO enterprise are simply insufficient to survive a motion to dismiss. See First Nationwide Bank v. Gelt Funding, Corp., 820 F.Supp. 89, 98 (S.D.N.Y.1993) (holding that the conclusion that "disparate parties were associated in fact by virtue of their involvement in the real estate industry in the 1980s" was simply insufficient to state a RICO claim).
Because plaintiffs have failed to state a claim under RICO, this cause of action must be dismissed.[20]

CONCLUSION
For the foregoing reasons, the Court grants defendants' motion to dismiss each of plaintiffs' claims. Since the Court finds that there is no just reason for delay in the appeal of this issue, the Court directs the Clerk of the Court to enter judgment dismissing the Complaints as against defendants party to this motion pursuant to Fed.R.Civ.P. 54(b).
It is SO ORDERED.
NOTES
[1] This group includes the action in Brown v. Amdahl Corp., 02 Civ. 10062(JES), since the complaint and prayer for relief are the same as that in the Ntsebeza actions.
[2] Plaintiffs also rely on 28 U.S.C. §§ 1331 and 1332, which provide for federal question and diversity jurisdiction, respectively.
[3] Pursuant to this Court's Order dated May 21, 2003, this Motion is limited to those defendants as to whom the Court's personal jurisdiction is not contested. In addition, not all defendants party to this motion are defendants in each of the above-captioned actions.
[4] Defendants also argue that there is no case or controversy for this Court to hear under Article III of the Constitution because plaintiffs cannot establish that they have standing to bring this action and because the matter is a non-justiciable political question. See Memorandum of Law in Support of Defendants' Joint Motion to Dismiss at 3-4. Given the Court's finding that defendants are entitled to relief on other grounds, the Court need not address these remaining grounds for defendants' motion.
[5] Digwamaje plaintiffs also allege violations of the Torture Victim Protection Act, 28 U.S.C. § 1350 note, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. As discussed infra, the Court finds that Digwamaje plaintiffs have failed to state cognizable claims under these provisions.
[6] The allegations that follow are taken from the various Complaints and are presumed to be true for purposes of this Motion. See Jaghory v. New York State Dep't of Educ, 131 F.3d326, 329 (2d Cir.1997).
[7] The specific date of the end of apartheid is a matter of some debate that is largely irrelevant here. Plaintiffs argue that the election of Nelson Mandela as President in 1994 signaled the end of apartheid, see Digwamaje Second Amended Class Action Complaint ¶ 69, while defendants point to the lifting of economic sanctions by the United States in 1991, Exec. Order No. 12,769, 56 Fed.Reg. 31,855 (July 10, 1991), as apartheid's final breath,> see Memorandum of Law in Support of Defendants' Joint Motion to Dismiss at 59-60.
[8] A Third Consolidated and Amended Complaint, dated May 16, 2003, was delivered to Chambers pursuant to this Court's order, allowing amendment, dated April 28, 2003. That Complaint was never properly filed by Ntsebeza plaintiffs. This Court therefore will cite to the virtually identical Second Consolidated and Amended Complaint. This Complaint, which was filed in the action docketed as 02 Civ. 4712(JES), is substantially the same as the Complaints filed in the other Ntsebeza and Brown actions and thus all references will be to this Complaint.
[9] A chilling excerpt of comments made during a Cabinet meeting at the time of the Soweto incident indicates that the Minister of Police proposed "that this movement must be broken and thinks that police should perhaps act a bit more drastically and heavy-handedly which will entail more deaths. Approved." K. Compl. ¶ 206.
[10] Justice Scalia disagreed with the reasoning of the majority. He remarked that the majority approach of creating federal common law out of international norms and then creating brand new causes of action out of the purely jurisdictional ATCA was "nonsense upon stilts." Sosa, 124 S.Ct. at 2772 (Scalia, J., concurring).
[11] Khulumani plaintiffs do not make this contention. See Khulumani Plaintiffs' Response to Defendants' Joint Motion to Dismiss at 2.
[12] It is this argument which led the Court in Presbyterian Church to reject the application of Central Bank to the issue at hand. See Presbyterian Church, 244 F.Supp.2d at 321. While this Court disagrees with that conclusion, it also notes that Presbyterian Church was decided before the Court's ruling in Sosa, which made clear that deference to Congress and a restrained understanding of new international norms was required of the lower federal courts in this area.
[13] See Sosa, 124 S.Ct. at 2768 (remarking that the implications of allowing arbitrary arrest to support ATCA jurisdiction were breathtaking, and that if plaintiff could not establish that defendant was a state actor then "he would need a rule broader still" in order to get jurisdiction).
[14] Given the Court's ruling, there is no need to reach the question of whether plaintiffs' allegations are sufficient to state a claim for aider and abettor liability. Considering, however, this case's similarity to the venerable ruling in United States v. Falcone, 109 F.2d 579 (2d Cir. 1940), it seems unlikely that defendants would be liable as aiders and abettors here.
[15] As stated above, although plaintiffs wholeheartedly contend that they are not seeking to rest jurisdiction on the basis of "doing business" in South Africa, the vast majority of plaintiffs' allegations consist of defendants' business activities coupled with the legal conclusion that this constituted aiding and abetting. Since this Court has found that aiding and abetting liability will not serve as a basis for ATCA jurisdiction, it will consider plaintiffs' claims under the rubric of doing business in South Africa.
[16] Reliance on the Restatement (Third) of Foreign Relations Law section 702 is misplaced for the same reason. The apartheid regime, and not defendants, engaged in the behavior that is the subject of that section. In addition, the Restatement will only be relied upon "not for the speculations of [its] authors concerning what the law ought to be, but for trustworthy evidence of what the law really is." The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900).
[17] There are a number of practical reasons for the prohibition on finding that broad aspirational language states customary international law. Besides the obvious difficulty of enforcing a principle that is so purposefully general in order that the greatest number of countries can agree while still disagreeing on the particulars of how to implement the goal, see Flores, 343 F.3d at 161, there is also the great problem that international agreements often set patently unattainable goals that cannot reasonably be considered legal obligations of those countries that hope to one day fulfill those aspirations. See, e.g., Kellogg-Briand pact of 1928, 46 Stat. 2343 (1928) (renouncing war as an instrument of national policy and proclaiming that disputes will only be resolved by peaceful means).
[18] This Court does not, and needs not, decide whether cases dealing with violations of the law of nations may be brought under federal question jurisdiction. However, the Court in Sosa seemed to indicate that the articulating of new international law violations is unique to the ATCA. See Sosaa, 124 S.Ct. at 2765 n. 19.

There is no diversity jurisdiction as to Digwamaje plaintiffs because citizens of New York appear as both plaintiffs and defendants. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806). Khulumani and Ntsebeza plaintiffs utterly fail to plead facts that show that diversity jurisdiction exists. See John Birch Soc. v. Nat'l Broadcasting Co., 377 F.2d 194, 197-98 (2d Cir. 1967); Equitable Life Assurance Soc. v. Alexander Grant & Co., 627 F.Supp. 1023, 1025-26 (S.D.N.Y. 1985). Therefore, all state law claims are likewise dismissed, as this Court does not have jurisdiction to hear them.
[19] The Court need not consider defendants' arguments that plaintiffs' TVPA claim is otherwise barred by the statute of limitations, by failure to exhaust remedies in South Africa, or by the non-applicability of the statute to corporate defendants. Compare Friedman v. Bayer Corp., No. 99-CV-3675, 1999 WL 33457825, at *2 (E.D.N.Y. Dec.15, 1999) (finding that TVPA did not apply to corporations), and Beanal v. Freeport-McMoRan, Inc., 969 F.Supp. 362, 382 (E.D.La.1997), with Sinaltrainal v. Coca-Cola Co., 256 F.Supp.2d 1345, 1358-59 (S.D.Fla.2003) (allowing suit against corporation under TVPA), and Wiwa, 2002 WL 319887, at *14n. 16.
[20] Because of the paucity of the pleadings on the existence of a RICO enterprise, this Court finds no need to address the remaining elements of the RICO claim