**Rabbi Avi WEISS and Rosa Sacharin, Plaintiffs,**

v.

**The AMERICAN JEWISH COMMITTEE, Defendant.**

**No. 03 Civ. 5727(JES).**

United States District Court, S.D. New York.

Sept. 14, 2004.

---

Rothwell, Figg, Ernts & Manbeck, Steven Lieberman, Lisa Phillips, of counsel, Washington, D.C., for Plaintiffs.

Arent, Fox, Kintner, David N. Wynn, of counsel, New York, NY, Plotkin & Kahn, PLLC, Barbara Wahl, of counsel, Washington, D.C., for Defendant.

Charles Chotkowski, Fairfield, CT, Amicus curiae in support of Defendant, pro se.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiffs Rabbi Avi Weiss ("Rabbi Weiss") and Rosa Sacharin ("Sacharin") (Rabbi Weiss and Sacharin together, "plaintiffs"), both descendants of Jews murdered during the Holocaust in the Belzec death camp in Poland, commenced this action in order to stop defendant The American Jewish Committee (the "AJC" or "defendant") from continuing to fund the construction of a trench which runs through the site of the Belzec death camp (the "Site") as part of the Holocaust victims memorial being constructed there. Plaintiffs filed a motion for a preliminary injunction and defendant moved to dismiss on the grounds that, among others things, Sacharin has failed to state a claim under the Alien Tort Claims Act, 28 U.S.C. § 1350 (the "ATCA").[1] Because the Court finds that Sacharin's ATCA claim must fail, defendant's motion is granted and plaintiffs' motion is denied.

## BACKGROUND

About 160 miles northeast of Cracow, in Poland, and 100 miles southeast of Warsaw, lies a tract of land which is destined forever to serve as a tragic reminder of one of the darkest chapters in human history—the site of what was once the Belzec death camp, where Nazi Germany implemented with horrific precision and efficiency one of the stages in Hitler's plan known as the Final Solution. *See* Verified Complaint ("Compl.") at ¶ 16. It is here that between March, 1942 and March, 1943 approximately 600,000 innocent Jewish men, women, and children were brought from surrounding regions of Poland, most completely unaware of the terrible fate that awaited them. *See id.* at ¶ 17. Shortly after their arrival at Belzec, the unsuspecting victims were forcibly led to their execution in the gas chambers, where they stood breathing in carbon monoxide until death finally put an end to their last agonizing moments. *See id.* at ¶ 19. After the gassings were complete, the bodies of the murdered victims were dumped into mass burial pits. *See id.* at ¶ 20.

In the spring of 1943, with the tides of war slowly turning and their "work" at Belzec nearly complete, the Germans apparently became concerned about the consequences they might one day have to face for their horrific actions and decided to destroy all evidence of their deeds. Consequently, the bodies of the murdered victims were removed from the mass graves, doused with flammable material, and cre-

---

1. Defendant further contends that the Court should decline to adjudicate this case because it presents a fundamentally religious dispute, and that dismissal is also warranted for (1) failure to join the government of Poland, an indispensable party and (2) failure to state a cause of action for intentional and negligent infliction of emotional distress. *See* Defendant's Memorandum in Support of Motion to Dismiss and in Opposition to Plaintiffs' Mo-

tion for Preliminary Injunction at 1. Because the Court finds that Sacharin fails to state a claim under the ATCA and, due to the lack of complete diversity among the parties, *see, e.g., Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 68 (2d Cir.1990), the Court is thus without subject matter jurisdiction, it need not address the remaining grounds for defendant's motion.

mated. *See id.* at ¶ 20–21. Special bone-crushing machines were used to reduce to shards the large bones which survived cremation. *See id.* at ¶ 22. The remains were dumped back into the burial pits, "leaving, in some of the pits, corpses at the lower levels but filling the upper portions of the pits with ashes and bone shards." *Id.* at ¶ 22.

In their haste, however, the Germans were not very careful in reburying what was left of the victims' remains and, because only a thin layer of soil was used to cover them, ashes and bone fragments lied on or close to the surface for decades after the conclusion of World War II.[2] *See* Declaration of Rabbi Andrew Baker, dated Sept. 5, 2003 ("Baker Decl.") at ¶ 4; *see also* Compl. at ¶ 22. In addition, after the war was over members of the local population came to the Site to dig through the ground in the hopes of finding valuables that may have been secreted inside the bodies of the Jewish victims. *See* Compl. at ¶ 24. In the 1960s the Polish government created on the Site a memorial park to victims of fascism, erecting a memorial structure and landscaping the camp area "to create a memorial zone with symbolic flames and numerous pathways." Compl. at ¶ 25. This resulted in further dispersion of the ashes and bone shards throughout the Site. *See* Compl. at ¶ 26

The first effort to protect the integrity of the Site and to commemorate the victims began in 1998 through a partnership between the United States Holocaust Museum (the "Museum") and Rada Ochrony Pamieci Walk i Meczenstwa ("Rada"), an agency of the Polish Government charged with the oversight of the Nazi concentration camp sites in Poland. *See* Baker Decl. at ¶ 5; *see also* Declaration of Rabbi Michael Schudrich, dated September 5, 2003 ("Schudrich Decl."), at ¶ 5. Although the record is not entirely clear as to the precise respective roles played by Rada and the Museum, it appears that the Museum's primary role was that of providing financial support, while Rada conducted an archeological survey to identify the exact boundaries of the mass graves and selected a memorial design to commemorate the Belzec victims (the "Memorial").[3] *See* Baker Decl. at ¶ 9; Schudrich Decl. at ¶ 5.

In the summer of 2002, when the Museum sought to withdraw from its involvement with the Memorial, the AJC agreed to assume the role as Rada's international partner. *See* Lieberman Decl., Exh. 3, the Overview, at 1. In light of the serious concerns raised by the development of the Site and construction of the Memorial because of the need to comply with Jewish law (Halacha[4]) governing the treatment of human remains, the AJC requested that Rabbi Schudrich, currently the Rabbi of the Jewish communities of Warsaw and Lodz in Poland, assume responsibility for compliance with Halacha. *See* Schudrich

---

**2.** A Polish Court which visited the Belzec site on October 10, 1945 found bones, women's hair, false teeth, hands, and children's body parts still lying on the surface. *See* Compl. at ¶ 28.

**3.** Rabbi Michael Schudrich has written that "design for the memorial [was] selected by an international committee of Holocaust memorialization experts and approved by the highest halachic authority...." Affidavit of David N. Wynn, dated September 5, 2003 ("Wynn Aff."), Exhibit ("Exh.") A, Michael Schudrich, *Let Belzec Victims Finally Rest in Peace*, FORWARD, July 25, 2003, at 1. Defendant's own website indicates that the partnership between the Museum and Rada "led to a memorial design competition and the selection of a new monument by an international panel of judges in June 1997." Declaration of Steven Lieberman, dated August 8, 2003 ("Lieberman Decl."), Exh. 3, Belzec Memorial Project Overview (the "Overview"), at 1, at http://www.ajc.org/belzec.asp.

**4.** Halacha is a body of Jewish law recognized by the traditional Jewish community. *See* Schudrich Decl. at ¶ 4.

Decl. at ¶¶ 2, 6. Rabbi Schudrich, in turn, sought the opinions of other rabbinical authorities, including Rabbi Elyakim Schlesinger, a recognized authority on Holocaust sites, the Committee for Preservation of Jewish Cemeteries in Europe (the "Committee for Preservation"), a small group of rabbis associated with Rabbi Schlesinger, and Rabbi Israel Meir Lau, former chief rabbi of Israel. *See id.* at ¶¶ 8, 10. All expressed their support for the project. *See* Baker Decl., Exh. A, Letter from Rabbi Rafael Frank to Rabbi Schudrich, dated January 12, 2003 (conveying Rabbi Lau's endorsement for the proposed Memorial); Consent Decree of Rabbi Schlesinger and the Committee for Preservation, dated May 13, 2003 (stating that the Committee for Preservation has reviewed the concerns raised by Rabbi Weiss, and concluding that the project should be advanced "without any postponement or delay"); Statement of Rabbi Schlesinger, dated July 24, 2003 (reconfirming his support for the proposed Memorial).

In April of 2003, the AJC and Rada entered into a formal agreement (the "Agreement") to work together to construct "a dignified and accurate memorial commemorating the victims and protecting their remains" and also to construct a museum pavilion at the Site (the museum and the Memorial together, the "Project"). *See* Baker Decl., Exh. B, Agreement at § 1.1. The Agreement provided, among other things, that all construction work performed in connection with the Project would be subject to the joint approval of both parties and that the costs of the Project would be covered by the parties in equal parts. *See id.* at §§ 1.1, 1.2. The Agreement also designated Rada as the representative of both parties "in all issues regarding contacts with local authorities, designers, contractors and other people whose presence is necessary in connection with" the Project. *See id.* at § 1.5. Finally, the Agreement provided in Article 9 that Rada's obligation to supervise and monitor the construction of the Project would be subject in all respects to all the requirements that the Rabbi of Warsaw (at that time Rabbi Schudrich) or his representative (together, the "Rabbinic Authority") may "impose from time to time in order to satisfy applicable Jewish religious principles."[5] *Id.* at § 9.1.

In May, 2003 the AJC also entered into a Rabbinic Supervision Agreement (the "Supervision Agreement") with the Rabbinic Authority represented by Rabbi Schudrich, pursuant to which the Rabbinic Authority undertook to provide its opinion and supervise all aspects of the Project relating to compliance with Halacha. *See* Baker Decl., Exh. B, Supervision Agreement at § 1.2. The Supervision Agreement granted to the Rabbinic Authority the right to have its representative present at the Site while the construction was ongoing and the right to stop or require a modification of any portion of the construction process should the representative determine that a Halacha violation had occurred or was about to occur. *See id.* at § 1.4. Furthermore, the AJC agreed to "abide by the stated religious opinion of the Rabbinic Authority, including to stop work on the Project, if such work is in any manner in violation of [Halacha]." *Id.* at § 1.7. Finally, the Rabbinic Authority acknowledged that it was "fully familiar with the plans and specifications for the development of the Project and that these plans

---

5. For example, the commencement of construction at the Site was made subject to the review and approval of the Memorial designs by the Rabbinic Authority. *See* Baker Decl., Exh. B, Agreement at § 9.1. The Agreement also gave the Rabbinic Authority the right to be present at the Site at all times during construction, and the right "to stop or modify any portion of the construction process if [it] determines that such construction could result in a violation of any religious proscription or requirement." *Id.*

and specifications appear[ed] to be in conformity with [Halacha]." *Id.* at § 1.5.

One feature of the Memorial is a long passageway that cuts through the center of the Site at an angle (the "Trench"),[6] *see* Compl. at ¶ 33, and leads to a wall of remembrance. *See* Flinker Decl. at ¶ 5. The Trench is bounded on both sides by concrete walls. *See id.* It descends slowly into the ground to the depth of approximately nine (9) meters below the surface, such that whereas the concrete walls at the beginning of the Trench are only at ankle length, they rise to approximately sixteen (16) meters at the point where the Trench ends in the wall of remembrance. *See id.* This design was intended "to evoke the feeling of being trapped, of impending doom, and of the impossibility of escape," and apparently also "to prevent visitors from walking over the remains of the victims." Baker Decl. at ¶ 9.

It is the construction of this Trench which lies at the heart of this case. Since learning that large machines would be used to dig the Trench through the Site, Rabbi Weiss became involved in opposing the digging on the grounds that it would constitute a gross violation of Halacha and would result in further disturbance and desecration of the victims' remains.[7] *See* Declaration of Rabbi Weiss ("Weiss

Decl.")[8] at ¶ 16. Rabbi Weiss repeatedly conveyed his objections first to the Museum and later to the AJC through letters and phone calls, as well as articles and letters to the editor of various publications. *See id.; see also* Weiss Decl., Exh. 1, Letter from Rabbi Weiss to David Harris, dated May 7, 2003; Wynn Aff., Exh. C, Avi Weiss, *Adding Insult to Mass Murder at Belzec,* FORWARD, June 28, 2002; Wynn Aff., Exh. D, Amir Efrati, *Rabbis Call Uncompleted Belzec Memorial "Terrible Desecration,"* The Jerusalem Post Internet Edition, July 30, 2003; Wynn Aff., Exh. G, Beata Pasek, *New York Rabbi Petitions Polish Government to Stop Part of Memorial at Death Camp Site,* Associated Press, July 30, 2003. Rabbi Weiss also approached Rabbi Lau and Rabbi Schlesinger (both of whom, as previously discussed, had expressed their support for the Project) to ascertain whether, and on what basis, they had endorsed the construction of the Trench. *See* Weiss Decl. at ¶ 19. During his conversations with Rabbi Schlesinger, Rabbi Weiss learned that Rabbi Schlesinger, when approached about the Project, had been misled that "the only way the [P]roject could be built was if there were a[T]rench and that if the [T]rench were stopped, the Polish government would withdraw from the [P]roject."[9]

---

**6.** Plaintiffs describe the Trench as approximately 11.5 feet wide, up to thirty (30) feet deep, and hundreds of feet long. *See* Compl. at ¶ 33. Defendant, however, refers to it as a walkway that is 2.5 meters wide and 180 meters long. *See* Declaration of Dorota Flinker, dated September 7, 2003 ("Flinker Decl."), at ¶ 5.

**7.** Rabbi Weiss is the founder and dean of an orthodox rabbinical school in New York City, a senior Rabbi of a modern orthodox congregation, a member of Judaic faculty at Yeshiva University, and an author of several books and many newspaper articles. *See* Compl. at ¶¶ 5, 7–9.

**8.** The Court notes that the Declaration of Rabbi Weiss was submitted signed but not dated. In it, Rabbi Weiss refers to visiting the Site "last Wednesday, July 30, 2003." Weiss Decl. at ¶ 20. The Court assumes, thus, that the declaration was executed sometime during the first week of August, 2003, and will excuse plaintiffs' oversight in submitting the declaration undated.

**9.** Rabbi Weiss has been informed by an official at the Polish consulate in New York that "Poland desires only to comply with the wishes of the Jewish Community" regarding the construction of the Memorial. *See* Weiss Decl. at ¶ 26. Furthermore, a Polish construction foreman told Rabbi Weiss during his visit of the Site that "from a technical con-

Weiss Decl. at ¶ 26. In his conversations with Rabbi Lau on three different occasions, Rabbi Weiss learned that Rabbi Lau had no knowledge about the Project at Belzec. *See id.* at ¶ 28. In fact, Rabbi Lau's brother Naphtali Lau–Lavie wrote in a letter to Rabbi Weiss that "Rabbi Lau never received any detailed information concerning [the Project.] ... [H]e never received anything in writing describing the nature of the [P]roject. Therefore, he could not advise or rule [on] any halachic or other consideration regarding this [P]roject." *Id.*, Exh. 2, Letter from Naphtali Lau–Lavie to Rabbi Weiss, dated July 28, 2003.

On July 30, 2003, Rabbi Weiss visited the Site accompanied by Rabbi Shmuel Herzfeld, the Associate Rabbi at the Hebrew Institute of Riverdale, in New York, Robert Kalfus, a professional photographer employed by the New York Post, and Malekh Sheykhat, an expert in grave preservation with experience in preserving Jewish graves in Eastern Europe and the former Soviet Union. *See* Weiss Decl. at ¶ 20; *see also* Declaration of Rabbi Shmuel Herzfeld, dated August 3, 2003 ("Herzfeld Decl."), at ¶ 3. The visitors arrived at the Site at approximately 5:00 a.m., when the construction work was already in progress, and observed shards of human bone scattered throughout the Site. *See* Weiss Decl. at ¶¶ 20–21; Herzfeld Decl. at ¶¶ 4–5. Three large cranes, as well as cement trucks and bulldozers, were observed adjacent to the Trench, resting on soil full of bone shards. *See* Weiss Decl. at ¶ 21;

Herzfeld Decl. at ¶ 9. A dog, apparently belonging to one of the construction workers, "was roaming freely throughout the camp, including on the sites of mass graves." Weiss Decl. at ¶ 22; *see also* Herzfeld Decl. at ¶ 10. The construction workers freely walked and drove around the Site, and the visitors also observed scattered garbage and a portable toilet. *See* Herzfeld Decl. at ¶ 10. No representative of the Rabbinic Authority was present at the Site. *See* Herzfeld Decl. at ¶ 11; Weiss Decl. at ¶ 23.[10] Rabbi Weiss was extremely upset by what he observed during his visit. *See* Weiss Decl. at ¶ 35. Later that same day he and Rabbi Herzfeld demonstrated in front of the Presidential Palace in Warsaw, demanding that Polish president Kwasniewski "put an end to this madness immediately." Wynn Aff., Exh. E, Press Release, Amcha—the Coalition for Jewish Concerns, Rabbis to Polish President: Stop Desecrating the Remains of Holocaust Victims at Belzec Death Camp, July 30, 2003.

On July 17, 2003, plaintiffs commenced the current action in New York State Supreme Court, New York County, asserting claims for intentional infliction of emotional distress, negligent infliction of emotional distress, and a tort in violation of international law under the ATCA,[11] and seeking to stop the construction of the Trench. *See* Compl. at ¶¶ 1, 45–48, 52–55, 59–64. Defendant filed a Notice of Removal on August 1, 2003, and the Court set a briefing schedule for the plaintiffs' motion for a

---

struction point of view, the [T]rench could still be stopped and covered over" while the remaining construction of the Project continued. *See id.*

10. Alexander Wasowicz, a representative of Rabbi Schudrich and, apparently, his "eyes and ears" at the Site, arrived around 5:30 a.m. *See* Declaration of Alexander Wasowicz, dated September 5, 2003, at ¶ 4.

11. The factual predicate for both plaintiffs' claims is the displacement of their family members' remains at the Site caused by the construction of the Trench. Rabbi Weiss asserts state law claims of intentional and negligent infliction of emotional distress. *See* Compl. at ¶¶ 43–49, 52–56. Sacharin, who is a citizen of the United Kingdom, asserts a federal claim under the ATCA. *See* Compl. at ¶¶ 10, 59–64.

preliminary injunction and defendant's motion to dismiss.[12] During oral argument, the AJC informed the Court that the construction of the Trench had been completed. *See* Transcript of Oral Argument, dated October 17, 2003, at 98–99.[13]

## DISCUSSION

■ When considering a motion to dismiss, the Court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). Dismissal is inappropriate unless it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief. *See Sec. Investor Prot. Corp. v. BDO Seidman, LLP,* 222 F.3d 63, 68 (2d Cir.2000). Although courts on a motion to dismiss are generally limited to examining the sufficiency of the pleadings, where, as here, a challenge is directed at the court's subject matter jurisdiction, the Court may turn to materials outside the complaint to resolve jurisdictional issues. *See Filetech S.A. v. France Telecom S.A.,* 157 F.3d 922, 932 (2d Cir. 1998); *see also Scherer v. Equitable Life Assurance Soc'y of U.S.,* 347 F.3d 394, 401–02 (2d Cir.2003); *Exchange Nat'l Bank of Chicago v. Touche Ross & Co.,* 544 F.2d 1126, 1130–31 (2d Cir.1976) (Friendly, J).

In this case, as is evident from the statement of facts set forth above, there are some factual discrepancies reflected in the various affidavits submitted by the parties in connection with their motions. However, since none of these factual disputes is material or even relevant to the jurisdictional issue raised by defendant's motion, the Court sees no need to resolve any factual disputes raised by the affidavits.

### A. *Sacharin's Claim under the ATCA*

The ATCA vests district courts with "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. In its recent decision in *Sosa v. Alvarez–Machain,* —— U.S. ——, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004), the Supreme Court considered for the first time the question of whether the ATCA was a jurisdictional statute only or whether it created, or authorized the courts to recognize, any particular right of action. *See Sosa,* 124 S.Ct. at 2754. Although initially noting that the ATCA is a jurisdictional statute creating no new causes of action, the Supreme Court stated that "the jurisdictional grant is best read as having been enacted on the understanding that the common law would provide a cause of action for the modest number of international law violations with a potential for personal liability at the time." *Id.,* 124 S.Ct. at 2761. The Supreme Court, thus, assumed that at the time it enacted the ATCA as part of the Judiciary Act of 1789, "the First Congress understood that the district courts would recognize private causes of action for certain torts in violation of the law of nations" such as violations of safe conduct, infringements of the rights of ambassadors, and

---

**12.** The Court also received a brief, dated October 3, 2003, from Charles Chotkowski as *amicus curiae* in support of the defendant, urging the Court to decline to adjudicate this case based on the Act of State doctrine and also because it presents a religious dispute, the adjudication of which is barred by the Establishment Clause of the First Amendment.

**13.** AJC subsequently submitted a declaration from its representative at the Site, informing the Court that the excavation work on the Trench had been completed and the heavy equipment removed. *See* Declaration of Dorota Flinker, dated October 28, 2003, at ¶¶ 3–4.

piracy. *See id.* The Supreme Court also assumed, citing Congress's failure to amend the ATCA in any relevant way, that no development in the ATCA jurisprudence "has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law." *Id.*

While recognizing that an opening, however small, exists for courts to consider claims asserting new causes of action under the ATCA, the Supreme Court acknowledged that "good reasons [exist] for a restrained conception of the discretion a federal court should exercise in considering a new cause of action" under the ATCA. *See id.* Indeed, the Supreme Court cautioned the courts against recognizing claims "for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms" which were well established at the time the ATCA was enacted. *See id.*, 124 S.Ct. at 2765.

The Second Circuit, which has recognized claims under the ATCA since its decision in *Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980), has held that customary international law, a term used in the ATCA jurisprudence as a synonym for the "law of nations," *see Flores v. S. Peru Copper Corp.*, 343 F.3d 140, 143 n. 2 (2d Cir.2003), "is composed only of those rules that States universally abide by, or accede to, out of a sense of legal obligation and mutual concern." *Flores*, 343 F.3d at 154. Thus, practices "adopted for moral or political reasons, but not out of a sense of legal obligation, do not give rise to rules of customary international law." *Id.*

■ Sacharin rests her claim for a tort in violation of international law resulting from the displacement of her brother's remains by the digging of the Trench on two sources—Protocol Additional to the Geneva Conventions of 12 August 1949, and relating to the Protection of Victims of International Armed Conflicts ("Protocol I"), *opened for signature* Dec. 12, 1977, 1125 U.N.T.S. 3, 16 I.L.M. 1391, and the International Covenant on Civil and Political Rights (the "ICCPR"), *opened for signature* Dec. 19, 1966, 999 U.N.T.S. 171, 6 I.L.M. 368. *See* Compl. at ¶¶ 61–62. These instruments constitute proper evidence of customary international law to the extent they create legal obligations among the states that are parties to them. *See Flores*, 343 F.3d at 162. However, Sacharin has failed to demonstrate that "an overwhelming majority of States have ratified [Protocol I and the ICCPR and that] those States uniformly and consistently act in accordance with [their] principles." *Id.* at 162–63. Indeed, while Article 34 of Protocol I provides that the remains of those who died as a result of hostilities shall be respected, and the gravesites respected, maintained, and marked, this provision is not sufficiently definite and is not so uniformly observed as to give rise to a rule of international law prohibiting construction of a victims memorial at the site where such victims' remains may be found.

As for the ICCPR, neither the statement in Article 17 against arbitrary or unlawful interference with a person's privacy or family, nor the statement in Article 23 that "the family is the natural and fundamental group unit of society and is entitled to protection by society and the State," nor the statement in Article 27 that persons belonging to ethnic, religious, or linguistic minorities "shall not be denied the right ... to enjoy their own culture, to profess and practice their own religion, or to use their own language" is sufficiently definite to give rise to a rule of customary international law. The Court simply cannot find in the pronouncements of Protocol I and the ICCPR any specific, binding legal obligations with definite content and acceptance among civilized nations that would prohibit the digging of the Trench

through the Site as part of the construction of the Memorial. Accordingly, mindful of its duty of "vigilant doorkeeping" mandated by the Supreme Court in *Sosa*, the Court concludes that Sacharin has failed to plead a tort in violation of customary international law and dismisses her claim under the ATCA.[14]

## B. *Rabbi Weiss's State Law Claims*

Having dismissed Sacharin's federal cause of action, the Court declines to exercise its discretion to consider Rabbi Weiss's state law claims of intentional and negligent infliction of emotional distress and remands these claims to the New York State Supreme Court, New York County. *See* 28 U.S.C. § 1367(c)(1), (c)(3); *see also Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion to dismiss Sacharin's ATCA claim and remands the remaining state law claims for intentional and negligent infliction of emotional distress to New York State Supreme Court. The Clerk of the Court is hereby directed to close the above-captioned action.

It is **SO ORDERED.**

---

14. This is especially true here where the existence of any possible burial site desecration turns upon the resolution of theological disputes which the Court has not the competence, and perhaps even the jurisdiction, to resolve.