**Esther KIOBEL, et al., Plaintiffs,**

v.

**ROYAL DUTCH PETROLEUM COMPANY, et al.,
Defendants.**

**No. 02CIV7618KMWHBP.**

United States District Court,
S.D. New York.

Sept. 29, 2006.

Carey R. D'Avino, Keino R. Robinson, Stephen A. Whinston, Berger & Montague, P.C., Philadelphia, PA, for Plaintiffs.

Michael T. Reynolds, Rory O. Millson, Thomas G. Rafferty, Cravath, Swaine & Moore LLP, New York, NY, for Defendants.

## ORDER

KIMBA M. WOOD, District Judge.

Nigerian Plaintiffs bring a putative class action pursuant to the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350, against oil company Defendants. On March 18, 2003, Defendants moved to dismiss the Complaint ("First Motion to Dismiss") on the grounds that Plaintiffs' claims (1) are barred by the act of state doctrine; (2) are barred by the doctrine of international comity; and (3) fail to state claims on which relief can be granted. On March 11, 2004, Magistrate Judge Henry B. Pitman issued a Report and Recommendation ("March 11 Report"), recommending that the First Motion to Dismiss be denied in all respects. Defendants timely objected.

On May 17, 2004, Plaintiffs filed an amended complaint ("Amended Complaint"). Defendants thereafter filed a motion to strike the Amended Complaint or, in the alternative, to dismiss it ("Second Motion to Dismiss"). In the Second Motion to Dismiss, Defendants re-assert arguments raised in the First Motion to Dismiss and also argue that the Amended Complaint fails to state a claim, relying on an intervening Supreme Court decision, *Sosa v. Alvarez–Machain,* 542 U.S. 692, 124 S.Ct. 2739, 159 L.Ed.2d 718 (2004).

Magistrate Judge Pitman, by Report and Recommendation dated August 15, 2005 ("August 15 Report"), recommended that the Second Motion to Dismiss be denied in all respects. Magistrate Judge Pitman relied on his earlier analysis of the arguments raised in the First Motion to Dismiss and declined to consider Defendants' arguments under *Sosa.* He did so because, in his view, Defendants' *Sosa*-related arguments were (1) raised for the first time in their reply brief and thus procedurally defective; and (2) raised "in a perfunctory manner that is of little assistance to the court." Defendants timely objected.

This Court then denied Defendants' motion to strike the Amended Complaint and decided to consider Defendants' *Sosa*-related arguments in support of their assertion that Plaintiffs fail to state a claim. The Court invited the parties to submit supplemental briefing.

Familiarity with the March 11 and August 15 Reports, as well as this Court's prior orders, is assumed. The Court analyzes both Reports and the reasoning contained therein, along with the supplemental briefing submitted by the parties. Most of Defendants' objections are reiterations of arguments already made to, and carefully considered by, Magistrate Judge Pitman. The Court must, however, consider Defendants' objections *de novo.* See Fed.R.Civ.P. 72(b). Having reviewed Defendants' objections to Magistrate Judge Pitman's recommendation that this action is not barred by the act of state doctrine or the doctrine of international comity, the Court is persuaded that those objections are without merit. The Court thus adopts in full those portions of Magistrate Judge Pitman's recommendations, analysis for which is laid out in pages 12–27 of the March 11 Report.

There remain, then, the most important objections raised by Defendants: that the March 11 Report errs in recommending that Plaintiffs' claims not be dismissed for failure to state a claim, and that the August 15 Report fails to consider the Supreme Court's opinion in *Sosa*, which was issued after the March 11 Report, and, Defendants argue, markedly changed the landscape of the law of ATS claims. Defendants urge that in light of *Sosa*, none of Plaintiffs' claims is viable.

### Filartiga v. Pena–Irala

Prior to the Supreme Court's decision in *Sosa*, the controlling authority in this Circuit regarding the viability of claims under the ATS was *Filartiga v. Pena–Irala*, 630 F.2d 876 (2d Cir.1980). In *Filartiga*, the Second Circuit was asked to consider whether the ATS provides federal court jurisdiction for a Paraguayan citizen's torture claim against a former Paraguayan government official. The Second Circuit construed the ATS, "not as granting new rights to aliens, but simply as opening the federal courts for adjudication of the rights already recognized by international law." 630 F.2d at 887. The court therefore focused on whether "an act of torture committed by a state official against one held in detention violates established norms of the international law of human rights, and hence the law of nations." *Id.* at 880. The court ultimately held that "deliberate torture perpetrated under color of official authority violates universally accepted norms of the international law of human rights." *Id.* at 878.

In *Filartiga*, the court relied upon two Supreme Court decisions that articulated the appropriate sources of international law: *United States v. Smith*, 5 Wheat. 153, 18 U.S. 153, 5 L.Ed. 57 (1820) and *The Paquete Habana*, 175 U.S. 677, 20 S.Ct. 290, 44 L.Ed. 320 (1900). *Smith* held that the law of nations may be ascertained by consulting (1) "the works of jurists, writing professedly on public law;" (2) "the general usage and practice of nations;" or (3) "judicial decisions recognizing and enforcing that law." 630 F.2d at 880 (quoting *Smith*, 18 U.S. at 160–61, 5 Wheat. 153). *Habana* held that "where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of civilized nations; and, as evidence of these, to the works of jurists and commentators." *Id.* at 880–81 (quoting *Habana*, 175 U.S. at 700, 20 S.Ct. 290). The *Filartiga* court also read the *Habana* decision as having held that "[c]ourts must interpret international law not as it was in 1789, [when the ATS was enacted,] but as it has evolved and exists among the nations of the world today." *Id.* at 881.

The Second Circuit emphasized in *Filartiga* that there is a high bar for holding that a rule occupies the status of well-settled international law such that a district court may exercise jurisdiction under the ATS. *See id.* ("The requirement that a rule command the 'general assent of civilized nations' to become binding upon them all is a stringent one."). "It is only where the nations of the world have demonstrated that the wrong is of mutual, and not merely several, concern, by means of express international accords, that a wrong generally recognized becomes an international law violation within the meaning of the statute." *Id.* at 888.[1]

---

1. The court also noted dictum from an earlier Second Circuit decision, *IIT v. Vencap*, 519 F.2d 1001 (2d Cir.1975), that "a violation of the law of nations arises only when there has been 'a violation by one or more individuals of those standards, rules or customs (a) affecting the relationship between states or between an individual and a foreign state and (b) used by those states for their common good and/or dealings inter se.'" 630 F.2d at

The *Filartiga* court relied on several sources, including United Nations declarations, international treaties, and national constitutions, in concluding that torture by a state official is prohibited by the law of nations.[2] *Id.* at 881–84. The court did not specify whether any of these sources standing alone is sufficient to establish the existence of well-settled international law. *See id.* at 884 ("Having examined the sources from which customary international law is derived the usage of nations, judicial opinions and the work of jurists we conclude that official torture is now prohibited by the law of nations.").

*Sosa v. Alvarez–Machain*

The legal questions at issue in *Filartiga* were addressed by the Supreme Court twenty-four years later in *Sosa.* In *Sosa*, Humberto Alvarez–Machain ("Alvarez"), a Mexican physician, had brought suit against a Mexican citizen for arbitrary detention—an alleged violation of the law of nations—under the ATS. Alvarez had been detained for less than one day, but he argued that even that short a detention was actionable as "officially sanctioned action exceeding positive authorization to detain under the domestic law of some government, regardless of the circumstances." 542 U.S. at 736, 124 S.Ct. 2739. The *Sosa* Court rejected that argument, and held that "a single detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment,

violates no norm of customary international law so well defined as to support the creation of a federal remedy." *Id.* at 738, 124 S.Ct. 2739.

The *Sosa* court explicitly declined to adopt specific criteria for determining when a court has jurisdiction over a claim pursuant to the ATS. *See id.* at 731, 124 S.Ct. 2739 ("[w]hatever the ultimate criteria for accepting a cause of action subject to jurisdiction under § 1350 ... "). The Court did, however, state some of the criteria for rejecting such a claim: "the federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted." *Id.* The Court recognized how difficult it is to gauge whether a norm has sufficiently definite content and acceptance among civilized nations: "although it is easy to say that some policies of prolonged arbitrary detentions are so bad that those who enforce them become enemies of the human race, it may be harder to say which policies cross that line with the certainty afforded by Blackstone's three common law offenses."[3] *Id.* at 737, 124 S.Ct. 2739. The Court then states, confusingly, that whether a norm is sufficiently *definite* turns in part on the *practical consequences* of allowing suit based upon a breach of

---

888 (quoting *IIT*, 519 F.2d at 1015). The court stated that it had "no quarrel with this formulation so long as it be understood that the courts are not to prejudge the scope of the issues that the nations of the world may deem important to their interrelationships, and thus to their common good." *Id.* at 888.

**2.** Specifically, the court relied on the United Nations Charter; the Universal Declaration of Human Rights, General Assembly Resolution 217; the Declaration on the Protection of All Persons from Being Subjected to Torture,

General Assembly Resolution 3452; international treaties and accords; the constitutions of over 55 nations; the Department of State, County Reports on Human Rights for 1979; and exchanges between United States embassies and foreign states. 630 F.2d at 881–84.

**3.** The three offenses recognized by Blackstone are: violation of safe conducts, infringement of the rights of ambassadors, and piracy. 542 U.S. at 724, 124 S.Ct. 2739.

that norm:[4] "the determination whether a norm is sufficiently definite to support a cause of action should (and, indeed, inevitably must) involve an element of judgment about the practical consequences of making that cause available to litigants in the federal courts." *Id.* at 732–33, 124 S.Ct. 2739.

The Court cited approvingly *Habana*'s articulation of the appropriate sources of international law (as had the Second Circuit in *Filartiga*), and characterized these sources as ones that the Court has "long, albeit cautiously recognized." *Id.* at 734, 124 S.Ct. 2739. The Court rejected two of the sources relied upon by Alvarez (the Universal Declaration of Human Rights and the International Covenant on Civil and Political Rights), stating that they have "little utility."[5] *Id.* at 734–35, 124 S.Ct. 2739. The Court also explicitly rejected as sources a survey of national constitutions, a case from the International Court of Justice, and "some authority from federal courts."[6] 542 U.S. at 736, 737 n. 27, 124 S.Ct. 2739.

In addition to rejecting the sources of law relied upon by Plaintiffs, the Court held that the fact that there are so many detentions argues against their being found to violate an international norm: "It is not that violations of a rule logically foreclose the existence of that rule as international law. . . . Nevertheless, that a rule as stated is as far from full realization as the one Alvarez urges is evidence against its status as binding law." *Id.* at 738 n. 29, 124 S.Ct. 2739.

Finally, the Court considered the practical consequences of recognizing a prohibition on arbitrary detention, and found that it would have "breathtaking" implications, as it would greatly broaden the jurisdiction of the federal courts. *Id.* at 736–37, 124 S.Ct. 2739.

### The State of ATS Law after Sosa

The *Sosa* opinion provides little guidance concerning which acts give rise to an ATS claim. As one district court noted, "the *Sosa* decision did not deliver the definitive guidance in this area that some had come to expect."[7] *In re S. African Apar-*

**4.** The Court may have intended to convey that *in addition to* considering whether a norm has sufficient definiteness and acceptance, a court should consider the practical consequences of allowing it to be the subject of suit in federal court.

**5.** The Court's reasoning was that the declaration "does not of its own force impose obligations as a matter of international law," and that the covenant although binding as a matter of international law was ratified by the United States "on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." 542 U.S. at 734–35, 124 S.Ct. 2739.

**6.** According to the Court, Plaintiff's survey purporting to show that many nations recognize a norm against arbitrary detention was at "a high level of generality;" the case from the International Court of Justice involved a detention that was "far longer and harsher

than Alvarez's;" and the federal court authority reflected "a more assertive view of federal judicial discretion over claims based on customary international law" than the Court was choosing to adopt. 542 U.S. at 737 n. 27, 124 S.Ct. 2739. The Court did not describe what the "authority from federal courts" consisted of.

**7.** The court analogized the lack of guidance to leaving a door "slightly ajar": "While it would have been unquestionably preferable for the lower federal courts if the Supreme Court had created a bright-line rule that limited the [ATS] to those violations of international law clearly recognized at the time of its enactment, the Supreme Court left the door at least slightly ajar for the federal courts to apply that statute to a narrow and limited class of international law violations beyond those well-recognized at that time. . . . That approach . . . of course . . . relegated to the lower courts the task of grappling with and determining what offenses against interna-

*theid Litig.,* 346 F.Supp.2d 538, 547 (S.D.N.Y.2004).

Certain language in the *Sosa* opinion suggests that the Court intended to signal its rejection of the broad scope of ATS jurisdiction asserted by the Second Circuit in *Filartiga.* The *Sosa* Court permits ATS jurisdiction only where the norm violated has the same definite content and acceptance among civilized nations as "the historical paradigms familiar when § 1350 was enacted," 542 U.S. at 732, 124 S.Ct. 2739; the *Filartiga* court had suggested that ATS jurisdiction is broader—the norm violated need only have commanded the "general assent of civilized nations, 630 F.2d at 881."

Other language in *Sosa* suggests that *Sosa* endorses the reasoning employed in *Filartiga. See* 542 U.S. at 732, 124 S.Ct. 2739 ("This limit upon judicial recognition is generally consistent with the reasoning of many of the courts and judges who faced the issue before it reached this Court. *See Filartiga.*"); *id.* at 731, 124 S.Ct. 2739 ("The position we take today has been assumed by some federal courts for 24 years, ever since the Second Circuit decided *Filartiga.*").

The general language cited above is, however, dicta. The *holding* in *Sosa* is very narrow: "It is enough to hold that a single detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the cre-

ation of a federal remedy." *Id.* at 738, 124 S.Ct. 2739.

In light of *Sosa*'s ambiguities, it would be inappropriate for a district court to assume that *Filartiga*'s view of the scope of ATS jurisdiction no longer controls. The Court therefore analyzes Plaintiffs' claims on the assumption that the *Filartiga* holding controls, and will dismiss claims only where they clearly run afoul of *Sosa.*

*Aiding and Abetting/Secondary Liability*

Plaintiffs' claims are essentially claims for secondary liability, i.e., claims that Defendants "facilitated," "conspired with," "participated in," "aided and abetted," or "cooperated with" government actors or government activity in violation of international law. *See* Am. Compl. ¶¶ 80, 90, 94, 98, 102, 107, 112, 116. Thus before addressing each of Plaintiffs' individual claims, it is appropriate for the Court to consider more generally the issue of secondary liability under the ATS.

■ It is a close question whether, following *Sosa,* private individuals can be held liable under the ATS for aiding and abetting violations of international law.[8] However, prior to *Sosa,* courts in this Circuit consistently allowed ATS suits rooted in theories of secondary liability. *See Presbyterian Church of Sudan v. Talisman Energy Inc.,* 244 F.Supp.2d 289, 320–21 (S.D.N.Y.2003) ("U.S. courts have consistently permitted [ATS] suits to proceed based on theories of conspiracy and aiding and abetting."). The Court thus concludes that where a cause of action for violation of

---

tional law fit within that narrow class of offenses." 346 F.Supp.2d at 547.

8. Because secondary liability was not at issue in *Sosa,* the Supreme Court mentions it only briefly. *See* 542 U.S. at 733 n. 20, 124 S.Ct. 2739 ("A related consideration [to a determination whether a norm is sufficiently definite to support a cause of action] is whether international law extends the scope of liability for

a violation of a given norm to the perpetrator being sued, if the defendant is a private actor."). Decisions issued in this District subsequent to *Sosa* reach different conclusions. *Compare S. African Apartheid Litig.,* 346 F.Supp.2d at 549–54, *with Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 374 F.Supp.2d 331, 337–41 (S.D.N.Y.2005).

an international norm is viable under the ATS, claims for aiding and abetting that violation are viable as well.[9]

*Property Destruction (Count VII)*

■ Plaintiffs allege that the "wanton destruction of Plaintiffs' real and personal property, directed at a distinct ethnic group ... constitutes discriminatory confiscation and destruction of property in violation of customary international law." Am. Compl. ¶ 115.

■ Defendants urge that, even before *Sosa*, claims for property destruction were not actionable under the ATS, and, that following *Sosa*, the same remains true. Defs.' Supplemental Mem. of Law Pursuant to the Ct.'s Jan. 3, 2006 Order ("Defs.' Mem.") at 3. This Court accepts Judge Allen G. Schwartz's reasoning that property destruction committed as part of genocide or war crimes, and not property destruction alone, violates the law of nations. *Presbyterian Church*, 244 F.Supp.2d at 325. Plaintiffs have not alleged genocide or war crimes. Therefore, Plaintiffs' claim for property destruction is dismissed.

*Forced Exile (Count VI)*

■ Plaintiffs allege that they were "forced to leave Ogoniland and Nigeria in fear of their lives or personal safety, or the lives and personal safety of their family members" and that "Plaintiffs' exile was a natural and intended consequence of the acts of the Nigerian military in support of Shell's operations in Ogoniland." Am. Compl. ¶ 110. Plaintiffs also allege that "[t]he use of unrestrained military violence

and extrajudicial punishments on Plaintiffs, their family members and other members of their community with the intent to cause Plaintiffs to leave permanently their residences and their homeland ... constitutes forced exile in violation of customary international law." *Id.* ¶ 111.

The only authority Plaintiffs cite to support their position that claims for "forced exile" are actionable under the ATS is this Court's decision in *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 civ 8386, 2002 WL 319887 (S.D.N.Y. Feb.28, 2002). *See* Pls.' Supplemental Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 14. However, in *Wiwa*, the Court considered whether allegations of forced exile are sufficient to state a claim for *"cruel, inhuman, or degrading treatment,"* not whether a claim for forced exile is actionable. 2002 WL 319887, at *7–9. The Court is unaware of any federal court decision in which a court has considered, much less allowed, a claim for forced exile pursuant to the ATS. In light of *Sosa*'s limiting principles, the Court dismisses Plaintiffs' claim for forced exile.

*Extrajudicial Killings (Count I)*

■ In the Amended Complaint, Plaintiffs allege that "[t]he utilization of the Special Tribunal under the conditions and procedures described herein to assess and administer capital punishment violates customary international law." Am. Compl. ¶ 89. Specifically, Plaintiffs allege that the Special Tribunal

> allowed and authorized: (a) the death penalty for acts committed before the Special Tribunal was formed; (b) [e]xe-

---

9. The Court notes that dictum in *Sosa* potentially implies that courts should consider secondary liability on a case by case basis, taking into account the specific primary violation at issue rather than secondary liability more generally. *See* 542 U.S. at 733 n. 20, 124 S.Ct. 2739. However, given that (1) the Su-

preme Court's directive is unclear, (2) secondary liability is mentioned in *Sosa* only in a footnote, and (3) dictum in *Presbyterian Church* implies that aiding and abetting claims pursuant to the ATS are viable generally, *see* 244 F.Supp.2d at 321, this Court declines to take that approach.

cution of sentences, including the death penalty, before review by a higher court or authority; (c) [m]eetings between the accused and their counsel only with the permission of and in the presence of a military officer; [and] (d) [t]rial without representation by counsel.

*Id.* ¶ 67. Plaintiffs also allege that defense counsel for the accused was "subjected to actual or threatened beatings or other physical harm" and that Defendants bribed witnesses to give false testimony. *Id.* ¶¶ 68, 70. According to Plaintiffs, this combination of activities constitutes extrajudicial killing in violation of international law.

This Court recognizes that some forms of extrajudicial killing may be "so bad that those who enforce them become enemies of the human race." *See Sosa*, 542 U.S. at 737, 124 S.Ct. 2739. However, just as the Supreme Court stated with regard to arbitrary detention, "it may be harder to say which policies cross that line with the certainty afforded by Blackstone's three common law offenses." *Id.*

Plaintiffs have not directed the Court to any international authority establishing the elements of extrajudicial killing, and the Court is aware of none.

The Court is thus unpersuaded that there is a well-defined customary international law that prohibits the conduct Plaintiffs allege to be extrajudicial killing. Accordingly, Plaintiffs' claim for extrajudicial killing is dismissed.

*Torture/Cruel, Inhuman and Degrading Treatment (Count III)*

■ Plaintiffs allege that the "physical and psychological punishment" administered by Defendants "constitutes torture and/or cruel, inhuman and degrading treatment in violation of customary international law." Am. Compl. ¶ 97. Plaintiffs allege, among other things, that they were shot, raped, beaten with various instruments, stripped of their clothing, tied up, forced to lie for hours in the tropical son, sprayed with chemicals, and denied adequate food, medical care, and sanitary facilities. *See, e.g., id.* ¶¶ 6–17, 62–63, 68–69, 71–72.

*Sosa* leaves unclear what conduct is included within "torture." *See* 542 U.S. at 736–37, 124 S.Ct. 2739. However, dictum in *Sosa* suggests that at least some forms of torture continue to provide a basis for actionable claims under the ATS. Although *Sosa* does not delineate which forms of torture are actionable under the ATS, the Court is persuaded that Plaintiffs' allegations (taken together, if not alone) are sufficient to state a claim.[10]

Defendants' Second Motion to Dismiss is therefore denied with respect to Plaintiffs' claim for torture.[11]

*Arbitrary Arrest and Detention (Count IV)*

■ Plaintiffs allege that the arrests and detention of certain Plaintiffs "were arbitrary, lacked minimal procedural safeguards, were effectuated for the purpose of facilitating Shell's operations in Ogoni-

---

**10.** Defendants argue that the Torture Victim Protection Act preempts Plaintiffs' claims for torture under the ATS. Defs.' Mem. at 4–6. The Court rejected this argument previously in the related case of *Wiwa*, and rejects it again here for the same reasons stated therein. *See Wiwa*, 2002 WL 319887, at *4.

**11.** Because this is a putative class action, the Court need not determine today which of the alleged atrocities constitutes torture or which particular Plaintiffs have viable claims. Because this Court here determines that Plaintiffs' torture claim is viable, the Court need not determine whether a claim for cruel, inhuman, and degrading treatment would be viable in the alternative.

land and thereby were in violation of customary international law." Am. Compl. ¶ 101. Plaintiffs allege that these detentions ranged in length from nine hours to over a year. Am. Compl. ¶¶ 6–10, 15, 17.

Defendants argue that Plaintiffs' claim should be dismissed, because there is no international norm specifying what constitutes arbitrary detention. Defs.' Mem. at 8–9. Defendants also contend that Plaintiffs' allegations do not satisfy the requirement that there have been a "state policy" of "prolonged" detention, because most Plaintiffs allege that they were arrested or detained only once, and "[w]ith the exception of Dr. Barinem Kiobel and Clement Tusima, who were charged with complicity in the murder of four Ogoni leaders by the Ogoni Civil Disturbances Tribunal, no *Kiobel* plaintiff alleges a detention of more than two months." *Id.* at 9–10.

The Court disagrees with Defendants' analysis. In *Wiwa*, the Court stated that "[u]nder international law, 'arbitrary detention' occurs when a person is detained without warrant or articulable suspicion, is not apprised of charges against him or her, and is not brought to trial." 2002 WL 319887 at *7. In that opinion, the Court declined to reach "whether, as a matter of law, [a plaintiff] must plead 'prolonged' detention in order to assert a valid claim under the [ATS]." *Id.* at *7 n. 6. Although, in *Sosa*, the Supreme Court rejected Alvarez's claim for arbitrary detention, the Court's holding is narrow, stating only that "a single detention of less than a day, followed by the transfer of custody to lawful authorities and a prompt arraignment, violates no norm of customary international law so well defined as to support the creation of a federal remedy." 542 U.S. at 738, 124 S.Ct. 2739. The Court's decision implies that where arbitrary detention is both prolonged and a result of state policy, it may be actionable under the ATS. *See id.* at 737, 124 S.Ct. 2739 (endorsing language from the Restatement (Third) of Foreign Relations Law of the United States that a "state violates international law if, as a matter of state policy, it practices, encourages, or condones ... prolonged arbitrary detention").

Here, a number of Plaintiffs plead arbitrary detention in excess of one day, and at least three plead detention of four weeks or more.[12] *See* Am. Compl. ¶¶ 7–9, 15. In addition, Plaintiffs allege that their detention was a result of state policy to detain Ogonis who opposed the pipeline. *Id.* ¶ 2. If these allegations are true (and for the purpose of considering Defendants' Second Motion to Dismiss, the Court must assume that they are), Defendants' activities constitute a state policy of prolonged arbitrary detention.[13] As a result, allowing these claims to proceed is in keeping with Second Circuit precedent and does not run afoul of the narrow holding in *Sosa.*

Accordingly, Defendants' motion to dismiss Plaintiffs' arbitrary detention claim is denied.

*Crimes Against Humanity (Count II)*

Plaintiffs allege that Defendants committed crimes against humanity:

[t]he acts described [in the Amended Complaint] constitute crimes against hu-

---

12. Plaintiffs also allege that Dr. Barinem Kiobel ("Kiobel") and Clement Tusima ("Tusima") were detained for over a year, Am. Compl. ¶¶ 6, 17, but Defendants argue that these detentions were not arbitrary because Kiobel and Tusima were charged by the Special Tribunal, Defs.' Mem. at 9–10.

13. Because this is a putative class action, the Court need not resolve now which particular Plaintiffs state viable claims.

manity, in violation of customary international law which prohibits acts such as extrajudicial killing, arbitrary arrest and detention, rape, torture or beatings under color of state law, property destruction, forced exile and other similar acts committed as part of a systematic assault against an identifiable population group.

Am. Compl. ¶ 93.

This Court has defined crimes against humanity as any of a certain number of acts, including rape, torture, and arbitrary detention, "committed as part of a widespread or systematic attack directed against any civilian population." *Wiwa*, 2002 WL 319887, at *9–10 (citing *Rome Statute of the International Criminal Court*). That "crimes against humanity" encompasses within its definition a number of other crimes, does not, as Defendants assert, render it a "catch-all" claim that necessarily lacks the specificity and definite content required under *Sosa*. *See* Defs.' Mem. at 6.

Where, as here, Plaintiffs have sufficiently alleged claims for torture and arbitrary detention, *see supra*, and have also alleged that these crimes were committed as part of an intentional, systematic attack against a particular civilian population, a claim for crimes against humanity is actionable under the ATS. *See Wiwa*, 2002 WL 319887, at *9–10. Therefore, Defendants' Second Motion to Dismiss is denied as to Plaintiffs' claim for crimes against humanity.

*Rights to Life, Liberty, Security and Association (Count V)*

■ Plaintiffs allege that the "beatings, shooting, arrests and detention of Plaintiffs by military personnel during peaceful demonstrations ... constitute violations of the right to life, liberty and security of person, and her [sic] rights to peaceful assembly and association." Am. Compl.

¶ 105. Plaintiffs also allege that the "arrest, detention, and executions of Ken Saro–Wiwa and John Kpuinen were violations of their rights to life, liberty, security, and freedom of association in violation of customary international law." *Id.* ¶ 106.

Defendants argue that "[t]here is no particular or universal understanding of the civil and political rights" covered by Plaintiffs' claim, and thus, pursuant to *Sosa*, these "rights" are not actionable under the ATS. Defs.' Mem. at 7–8. The Court agrees. *See Sosa*, 542 U.S. at 731, 124 S.Ct. 2739 ("[T]he federal courts should not recognize private claims under federal common law for violations of any international law norm with less definite content and acceptance among civilized nations than the historical paradigms familiar when § 1350 was enacted."). Defendants' motion to dismiss Count V is accordingly granted.

*Interlocutory Appeal Pursuant to 28 U.S.C. § 1292*

■ Pursuant to 28 U.S.C. § 1292(b), a court may certify an issue for interlocutory appeal if the court "is 'of the opinion' that (1) the order 'involves a controlling question of law' (2) 'as to which there is substantial ground for difference of opinion' and (3) 'that an immediate appeal of the order may materially advance the ultimate termination of the litigation.'" *Consol. Edison, Inc. v. Northeast Utils.*, 318 F.Supp.2d 181, 195 (S.D.N.Y.2004) (quoting 28 U.S.C. § 1292(b)). Whether to certify a question of law to the court of appeals lies largely in the district court's discretion. *See, e.g., Ferraro v. Sec'y of U.S. Dep't of Health & Human Servs.*, 780 F.Supp. 978, 979 (E.D.N.Y.1992). However, district courts must "exercise great care in making a § 1292(b) certification." *Westwood Pharm., Inc. v. Nat'l Fuel Gas Distribution Corp.*, 964 F.2d 85, 89 (2d

Cir.1992). "Interlocutory appeals are an exception to the general policy against piecemeal appellate review embodied in the final judgment rule." *Consol. Edison,* 318 F.Supp.2d at 195; *see also Flor v. BOT Fin. Corp.,* 79 F.3d 281, 284 (2d Cir.1996) (per curiam). As a result, "certification is warranted only in 'exceptional cases' where early appellate review 'might avoid protracted and expensive litigation.'" *Consol. Edison,* 318 F.Supp.2d at 196 (quoting *Telectronics Proprietary, Ltd. v. Medtronic, Inc.,* 690 F.Supp. 170, 172 (S.D.N.Y.1987)).

■ This decision easily satisfies the criteria stated in § 1292(b). This order decides several controlling questions of law. *See Klinghoffer v. S.N.C. Achille Lauro,* 921 F.2d 21, 23–24 (2d Cir.1990) ("Although the resolution of an issue need not necessarily terminate an action in order to be 'controlling,' . . . it is clear that a question of law is 'controlling' if reversal of the district court's order would terminate the action.").

In addition, the questions of law at issue in this order provide "substantial ground for difference of opinion." Reasonable minds may differ as to whether any of the acts described above is actionable under the ATS post-*Sosa. Compare S. African Apartheid Litig.,* 346 F.Supp.2d at 546–554, *Abdullahi v. Pfizer, Inc.,* No. 01 Civ. 8118, 2005 WL 1870811, at \*7–14 (S.D.N.Y. Aug. 9, 2005), *and Weiss v. Am. Jewish Comm.,* 335 F.Supp.2d 469, 475–77 (S.D.N.Y.2004), *with Presbyterian Church,* 374 F.Supp.2d. at 334–41.[14]

Finally, an immediate appeal will likely advance the termination of this litigation.

The case has been pending for over four years; discovery has been extensive and is ongoing; and a trial, were it to go forward, would be exceptionally protracted and expensive. All of this effort and expense would be for naught if the Court is incorrect in its conclusions as to the viability of Plaintiffs' claims.

*Conclusion*

For the reasons stated above, Defendants' Second Motion to Dismiss is granted as to Count I (extrajudicial killings), Count V (rights to life, liberty, security and association), Count VI (forced exile), and Count VII (property destruction), and is denied as to Count II (crimes against humanity), Count III (torture), and Count IV (arbitrary arrest and detention). The Court hereby certifies this order for interlocutory appeal to the Second Circuit pursuant to 28 U.S.C. § 1292(b).

SO ORDERED.

---

**14.** It is particularly unclear whether Second Circuit jurisprudence on aiding and abetting violations of international law can survive *Sosa,* given that the opinion directs courts to consider "whether international law extends the scope of liability for a violation of a given norm to the perpetrator being sued, if the defendant is a private actor such as a corporation or individual" and "the practical consequences of making that cause available to litigants in the federal courts." 542 U.S. at 733, 124 S.Ct. 2739.